[No. A116362. First Dist., Div. Three. Sept. 18, 2008.]

CENTER FOR BIOLOGICAL DIVERSITY, INC., et al., Plaintiffs and Appellants, v.
FPL GROUP, INC., et al., Defendants and Respondents.

**COUNSEL**

Richard R. Wiebe for Plaintiffs and Appellants.

James P. Wheaton and D. Adam Lazar for Environmental Law Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Zarian Midgley & Johnson, John N. Zarianand; Stoel Rives and Jason R. Houghton for Defendants and Respondents Pacific Winds Inc., Windworks, Inc., and Altamont Winds Inc.

Kaye Scholer, George T. Caplan, Kristopher S. Davis and Paul M. Gelb for for Defendants and Respondents GREP Bay Area Holdings, LLC, AES SeaWest WindPower, Inc., and enXco.

Ferguson & Berland, William S. Berland for Defendants and Respondents FPL Group Inc., FPL Energy, LLC, ESI Bay Area GP, Inc., ESI Bay Area, Inc., Altamont Power, LLC, and Green Ridge Power, LLC.

**OPINION**

**POLLAK, J.**—Plaintiffs, the Center for Biological Diversity, Inc., and Peter Galvin (collectively CBD),[1] appeal from the dismissal of their cause of action, which alleged that defendant owners and operators of wind turbine electric generators in the Altamont Pass Wind Resource Area in Alameda and Contra Costa Counties are, by the operation of their wind turbines, responsible for killing and injuring raptors and other birds in violation of the public trust doctrine.[2] The trial court dismissed their action after granting defendants' motion for judgment on the pleadings on the ground that private parties are not entitled to bring an action for the violation of the public trust doctrine arising from the destruction of wildlife. We conclude that the trial court properly dismissed this particular action, although we qualify its broad holding and reject even broader assertions advanced by defendants in support of its ruling. Wildlife, including birds, is considered to be a public trust resource of all the people of the state, and private parties have the right to bring an action to enforce the public trust. Nonetheless, in other proceedings of which we take judicial notice, the public agencies responsible for protecting these trust resources have taken action to do so. The proper means to challenge the adequacy of those measures is by petition for a writ of mandate or request for other appropriate relief brought against those agencies. Permitting the action to proceed as presented would require the court to make complex and delicate balancing judgments without the benefit of the expertise of the agencies responsible for protecting the trust resources and would threaten redundancy at best and inconsistency at worst.

---

[1] Plaintiffs' amended complaint describes the Center for Biological Diversity, Inc., as a nonprofit corporation with over 12,000 members, more than 4,400 of whom reside in California, "dedicated to the preservation, protection and restoration of biodiversity, native species, ecosystems, and public lands and resources." Peter Galvin is identified as the conservation director of the center.

[2] Defendants consist of two groups of business entities that have appeared through separate counsel: FPL Group, Inc., FPL Energy, LLC, ESI Bay Area GP, Inc., ESI Bay Area, Inc., Altamont Power, LLC, and Green Ridge Power, LLC, and GREP Bay Area Holdings, LLC, AES SeaWest, Inc. (formerly SeaWest WindPower, Inc.), and enXco, Inc.

## Background

In 1980, in response to federal legislation intended to encourage the development of alternative energy sources,[3] the State Energy Resources Conservation and Development Commission (California Energy Commission) created the Altamont Pass Wind Resource Area. Since 1981 and prior to September 2005, Alameda County issued 46 use permits to operate private wind energy generation facilities in the approximately 40,000-acre Alameda County portion of this area.[4] Plaintiffs' amended complaint alleges that there are currently more than 5,000 wind turbine generators operating in Altamont Pass. The amended complaint alleges that since the generators were first erected, "it has been known that in the process of generating electricity the Altamont Pass wind turbine generators kill and injure eagles, hawks, falcons, owls, and other raptors, as well as non-raptor birds. [¶] . . . Since the 1980's, the . . . generators . . . have killed tens of thousands of birds, including between 17,000 and 26,000 raptors—more than a thousand Golden Eagles, thousands of hawks, and thousands of other raptors." Further, the complaint alleges that "the vast majority" of the generators are inefficient and obsolete and that current state-of-the-art generators would produce many times more electricity per generator and destroy far fewer birds. Although "defendants have repeatedly announced various plans to replace their obsolete, first-generation wind turbine generators . . . with large state-of-the-art turbines . . . , [they] have never implemented any of these repowering plans, except for one small wind turbine generator replacement project involving just 31 turbines. Defendants expect to continue using the vast majority of the obsolete, first-generation wind turbine generators at Altamont Pass for 10 or more additional years."

Plaintiffs allege that defendants' conduct violates various provisions of California law (Fish & G. Code, §§ 2000, 3503.5, 3511, 3513, 3800, 12000; Pen. Code, § 597; Cal. Code Regs., tit. 14, §§ 472, 509) and of federal law (Bald Eagle Protection Act, 16 U.S.C. § 668 et seq.; Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; 50 C.F.R. §§ 10.13, 21.11, 22.11 (2008)). The first nine causes of action of plaintiffs' amended complaint allege claims under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.), each grounded on the alleged violation of one of these statutory provisions. The 10th cause of action was added to the pleadings after the passage of Proposition 64 at the general election on November 2, 2004, restricting standing to bring actions under section 17200 (see Bus. & Prof.

---

[3] Broad-ranging policies also have been adopted by the State of California and Alameda County to encourage the development of wind power in Altamont Pass. (E.g., State of Cal. Energy Action Plan, May 4, 2004; see fn. 18, *post*, & accompanying text.)

[4] The record contains no comparable specificity concerning the facilities in Contra Costa County. Nor does the record reflect the history of administrative proceedings authorizing the use of wind turbines in Contra Costa County.

Code, §§ 17203, 17204). The 10th cause of action alleges that defendants' "destruction of California wildlife is a violation of the public trust" and prays for declaratory and injunctive relief.[5] On October 12, 2006, the superior court entered an order granting motions for judgment on the pleadings. The court held that under the amendments to section 17200, plaintiffs lack standing to maintain the first nine causes of action, explaining in part: "Since loss of the power or right to control wildlife is, at most, loss of an abstract interest owned commonly by all members of the public, and not loss of property owned by plaintiffs individually that would potentially allow this court to order restitution, this court finds that plaintiffs do not have standing to bring the UCL claims alleged in this action." On appeal, plaintiffs do not challenge this ruling. The appeal is directed solely to the propriety of the court's ruling dismissing the 10th cause of action on the ground that "[n]o statutory or common law authority supports a cause of action by a private party for violation of the public trust doctrine arising from the destruction of wild animals."

Plaintiffs filed their initial complaint on November 1, 2004, and their amended complaint containing the 10th cause of action on April 15, 2005. When these pleadings were filed, administrative proceedings were underway in Alameda County in which consideration was being given to applications to extend (and consolidate) the existing 20-year conditional use permits to operate the wind turbines in the Alameda County portion of Altamont Pass.[6] Public hearings on applications for conditional use permits were first held in November 2003 before the East County Board of Zoning Adjustments. Plaintiffs and other environmental groups appeared at the hearing and subsequent rehearings, voiced their objections to the applications, and participated in the appeal process before the Alameda County Board of Supervisors.

It is not necessary to describe in detail the course of the extended administrative proceedings on the use permit applications.[7] We note, however, that these proceedings included eight public hearings between November 2003 and September 2005. In January 2004, Alameda County created a "Wind Power Working Group" consisting of representatives of California's Department of Fish and Game, the United States Fish and Wildlife Service,

---

[5] In view of the conclusions we reach concerning the propriety of dismissing plaintiffs' complaint, we need not address subsidiary issues that have arisen concerning the scope of relief encompassed in the prayer.

[6] All of the conditional use permits were for 20-year terms with reviews in five-year increments.

[7] We take judicial notice of the records of the proceedings before the East County Board of Zoning Adjustments and the Alameda County Board of Supervisors contained in the appellate appendices and in the requests for judicial notice submitted to this court. We do not assume the truth of the statements or opinions appearing in the administrative record, but take note simply of the fact of these proceedings.

the applicants, property owners, CBD, and other objectors and others, "to assist the County in addressing operational issues and identifying appropriate measures to reduce avian mortality." Alameda County received input and recommendations from this working group, from the California Energy Commission,[8] from the Attorney General,[9] from consultants and from many others. During this period CBD filed and dismissed an action in federal district court against many of the wind farm operators, and an unsuccessful attempt was made to mediate differences concerning implementation of recommendations in the report of the California Energy Commission.

Ultimately, on September 22, 2005, the Alameda County Board of Supervisors adopted a resolution granting the conditional use permits subject to nine new conditions on wind turbine use aimed at mitigating avian mortality.[10] The resolution included the recital that "the programs, requirements, procedures, legal and financial commitments and all other specifications as set forth in the conditions of approval for the use permit extensions are found to be necessary for the public health and safety and as a necessary prerequisite to ensure that the existing wind energy facilities . . . are managed in such a way as to . . . aggressively respond to the greatest extent feasible the ongoing but unintentional death of various species of raptors and other birds in the Altamont Pass area, while also maintaining sustainable levels of wind energy

---

[8] On August 9, 2004, the California Energy Commission issued a report entitled "Developing Methods to Reduce Bird Mortality in the Altamont Pass Wind Resource Area," which recommended eight measures as a first priority, another five measures for experimental investigation, and cessation of certain strategies previously used or considered, and improving the means by which bird deaths are reported. These recommendations were the subject of further study and refinement by the Wind Power Working Group.

[9] The Attorney General pointed to several deficiencies that it perceived in the proposed management plan and recommended "eight specific steps to reduce avian mortality while retaining the economic viability of wind energy production."

[10] The nine conditions included: "Immediate formation of a scientific review committee—balanced, independent technical experts appointed by Alameda County with expertise in avian issues and windmills" financed by the windmill companies; "[b]egin an intensive monitoring program immediately" funded by the windmill companies; "[b]egin a repowering program that requires each company to repower 10% of their windmills by year 4, 35% by year 8, 85% by year 10 and 100% by the 13[th] and final year"; "[d]evelop an EIR that will include . . . enabling repowering and studying the existing facilities, studying new wind technology, studying siting in the Altamont as a whole, assembling all data from all sources and reviewing offsite mitigation and how it can be used to encourage reductions in avian mortality"; "[r]equire existing turbines to shut down those identified as the most dangerous 2% of the turbines immediately and winter shutdowns of 2 months for every turbine immediately . . . escalat[ing] each year to reach a 3 ½ month winter shutdown and the removal of all tier 2 turbines in the short term by the end of the fifth year"; "[h]ave no opt out language for financial hardship"; and "[i]mplement immediately other identified [California Energy Commission] measures such as retrofitting all electrical lines, removing derelict turbines and relocating rock piles away from turbines." Several of these conditions were amplified in an "Avian Wildlife Protection Program and Schedule" incorporated as exhibit G to the Board of Supervisors Resolution, to which the applicants agreed by exercise of the use permit.

production as a renewable, non-polluting source of energy." The resolution made findings that "the use is required by the public need in that wind energy production in the Altamont Pass Wind Resource Area (APWRA) represents a major source of renewable energy" and that "[t]he use, if permitted, under all the circumstances and conditions of this particular case, would not . . . be materially detrimental to the public welfare . . . ."

Shortly thereafter an organization named Californians for Renewable Energy (CARE) and several chapters of the National Audubon Society filed two separate superior court actions seeking writs of mandate to set aside the Alameda County Board of Supervisors resolution for alleged noncompliance with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and with provisions of the planning and zoning codes. (*Californians for Renewable Energy v. County of Alameda* (Super. Ct. Alameda County, 2005, No. RG05239552, *Golden Gate Audubon Society v. Alameda County Board of Supervisors* (Super. Ct. Alameda County, 2005, No. RG05239790) (the CEQA actions).)[11] Although CBD had participated actively in all phases of the proceedings before the East County Board of Zoning Adjustments and the board of supervisors, it did not join in either of these actions or institute any other action to set aside the approval of the conditional use permits.

On August 30, 2005, before the Alameda County Board of Supervisors had taken its final action on the pending use permit applications, the superior court (Hon. Ronald M. Sabraw) heard and denied defendants' motion to dismiss or stay this action. The motion was based on the grounds that the court should abstain from adjudicating the controversy because of several federal, state, and local agency investigations into whether defendants were complying with the various statutes plaintiffs allege they are violating, and on the doctrine of primary jurisdiction. In refusing to stay the action based on the latter ground, the court stated, "The Alameda County entities are currently engaged in a review of the windmill operations of the defendants. This court will not enter orders directing defendants to comply with the various bird protection statutes until the Alameda County entities agencies [*sic*] have had

---

[11] We take judicial notice that this litigation was settled in January 2007 by an agreement that modified the conditional use permits issued to certain of the defendants "with regard to various measures to reduce raptor mortality at the APWRA." Among other provisions, the revised conditions call for "a 50% reduction in raptor mortality" within three years and "adaptive management measures" if that objective is not met, annual meetings between the defendants, the plaintiffs, the county, and the scientific review committee "to determine if mutually acceptable mid-course corrections in measures to reduce raptor mortality are appropriate after the [scientific review committee] evaluates the prior year's monitoring data," increased shutdowns of designated turbines, a study to determine whether blade painting reduces raptor mortality, and the development of a Natural Communities Conservation Plan "to address the long-term operation of wind turbines at the APWRA and the conservation of impacted species of concern and their natural communities."

the opportunity to complete their process and issue their decisions. This will allow the court to take advantage of administrative expertise and help assure uniform application of regulatory laws."

After considering several factors relevant to the appropriateness of a stay, the court concluded "that the best course of action [was] to (1) wait for September 22, 2005, when the Alameda County entities should conclude their regulatory process, (2) give plaintiffs and defendants 30-60 days to file a writ or appeal seeking review of that resolution, (3) manage any writ or appeal together with this case, and (4) resolve whether plaintiffs' appropriate procedural route is to (a) continue pursuing this action, (b) seek review of the Board decision through a writ proceeding or otherwise, or (c) pursue both avenues."

In response to a renewed motion to dismiss or stay this action after the Alameda County Board of Supervisors acted on September 22, 2005, the court reaffirmed its denial of the motion, but transferred the action to the department in which the two CEQA actions (which had been consolidated) were pending. The court gave the following explanation: "Because the UCL claim against the defendants in this case is different in nature from the CEQA claim against Alameda County in the CEQA case, the Center for Biological Diversity can pursue this case while other entities are pursuing the CEQA case. The court is, however, concerned about the possibility that the defendant windmill operators would be subject to one set of restrictions imposed by the Alameda County Planning Department/Board of Zoning Adjustment and a second set imposed by this court. Thus, it seems appropriate that this case and the pending CEQA case should be managed by the same judge in order to avoid the specter of conflicting or inconsistent orders."

Following the transfer of this action to the Honorable Bonnie Lewman-Sabraw, before whom the CEQA actions were pending, defendants moved for judgment on the pleadings and, as indicated above, the motion was granted. Following the entry of judgment, plaintiffs filed a timely notice of appeal. After the parties had concluded the initial round of briefing, this court submitted a request for supplemental briefing on several subjects, which all parties have submitted as requested.

## DISCUSSION

*The public trust doctrine applies to wildlife, including raptors and other birds.*

Defendants' first line of defense is that the public trust doctrine applies only to tidelands and navigable waters, and has no application to

wildlife. While the public trust doctrine has evolved primarily around the rights of the public with respect to tidelands and navigable waters, the doctrine is not so limited. "[T]he public trust doctrine is not just a set of rules about tidelands, a restraint on alienation by the government or an historical inquiry into the circumstances of long-forgotten grants." (Sax, *Liberating the Public Trust Doctrine from Its Historical Shackles* (1980) 14 U.C. Davis L.Rev. 185, 186.) "Whatever the doctrine may have meant in Roman law, in medieval continental Europe, or in English law, the courts in this country have treated the public trust largely as a public property right of access to certain public trust natural resources for various public purposes." (Dunning, *The Public Trust: A Fundamental Doctrine of American Property Law* in Issues in Legal Scholarship: Sax and the Public Trust (Cooter et al. edits., 2003) p. 4, fns. omitted <http://www.bepress.com/ils/iss4/art5> [as of Sept. 18, 2008].)[12]

■ The California Supreme Court has unequivocally embraced and expanded the scope of the public trust doctrine insofar as it relates to tidal and navigable bodies of water. (E.g., *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 435 [189 Cal.Rptr. 346, 658 P.2d 709] (*National Audubon Society*); *City of Berkeley v. Superior Court* (1980) 26 Cal.3d 515 [162 Cal.Rptr. 327, 606 P.2d 362] (*City of Berkeley*).) These relatively recent cases reflect the property rights rationale that historically underlies the doctrine, reiterating that the state holds tidelands and navigable waters "not in its proprietary capacity but as trustee for the public." (*City of Berkeley, supra*, at p. 521; see *National Audubon Society, supra*, at p. 434.) Both *National Audubon Society* and *City of Berkeley* hold that the public trust ensures more expansive public use of trust property than was the case historically. "Although early cases expressed the scope of the public's right in tidelands as encompassing navigation, commerce and fishing, the permissible range of public uses is far broader, including the right to hunt, bathe or swim, and the right to preserve the tidelands in their natural state as ecological units for

---

[12] The public trust doctrine has been characterized as "resoundingly vague, obscure in origin and uncertain of purpose." (1 Rodgers' Environmental Law, § 2.20, p. 1.) It has been described as "a transcendent legal principle. While its articulations can be found in European civil law, English common law and its reflection noted in United States statutory and constitutional law, its roots are in natural law." (Meyers, *Variation on a Theme: Expanding the Public Trust Doctrine to Include Protection of Wildlife* in Issues in Legal Scholarship: Sax and the Public Trust (2003) pp. 9–10, fns. omitted <http://www.bepress.com/ils/iss4/art7/> [as of Sept. 18, 2008] (Meyers).) "The approach with the greatest historical support holds that certain interests are so intrinsically important to every citizen that their free availability tends to mark the society as one of citizens rather than serfs. [Fn. omitted.] It is thought that, to protect those rights, it is necessary to be especially wary lest any particular individual or group acquire the power to control them. . . . [¶] An allied principle holds that certain interests are so particularly the gifts of nature's bounty that they ought to be reserved for the whole of the populace." (Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention* (1970) 68 Mich. L.Rev. 471, 476.)

scientific study." (*City of Berkeley, supra,* at p. 521.) " 'There is a growing public recognition that one of the most important public uses of the tidelands—a use encompassed within the tidelands trust—is the preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area.' " (*National Audubon Society, supra,* at pp. 434–435.)

While these cases recognize that an important purpose of the public trust over bodies of water is to protect the habitat for wildlife, neither was addressing whether a public trust protects the wildlife itself. In *City of Berkeley* the court held that tidelands in San Francisco Bay conveyed to private parties pursuant to authorizing legislation nonetheless remained subject to the public trust, except to the extent that intervening events had rendered the property substantially valueless for trust purposes. In *National Audubon Society* the court held that the public trust doctrine is one component of California's integrated system of water law, imposing a continuing duty on the state to take trust uses into account in allocating water resources, and requiring a reconsideration of the allocation that had been made of the waters in the Mono Basin. Both cases spoke of the scope of the public trust in these contexts, but neither the holdings, analysis or dicta suggest that bird life or other wildlife are not within the scope of the public trust doctrine.[13]

To the contrary, it has long been recognized that wildlife are protected by the public trust doctrine. "Because wildlife are generally transient and not easily confined, through the centuries and across societies they have been held to belong to no one and therefore to belong to everyone in common." (Huffman, *Speaking of Inconvenient Truths—A History of the Public Trust Doctrine,* p. 63 <http://works.bepress.com/james_huffman/1/> [as of Sept.

---

[13] The same is true of the subsequent Court of Appeal decisions on which defendants place great reliance. In *Golden Feather Community Assn. v. Thermalito Irrigation Dist.* (1989) 209 Cal.App.3d 1276 [257 Cal.Rptr. 836], the court held that the public trust doctrine does not compel appropriators of water from a nonnavigable stream to maintain an artificial reservoir for the recreational use of the public. Far from excluding wildlife from the scope of the public trust doctrine, the court acknowledged that "[t]he general right and ownership of wild animals, the most important constituent of which are fish, is in the people of the state." (*Id.* at p. 1282, citing *People v. Truckee Lumber Co.* (1897) 116 Cal. 397 [48 P. 374], a case on which plaintiffs here heavily rely.) The court there distinguished between an action to enjoin a nuisance harming public fisheries, justified by the public trust doctrine, and an attempt to compel parties to maintain a reservoir so that others could fish from it, which the public trust doctrine does not require. (209 Cal.App.3d at p. 1282.) In *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 709 [7 Cal.Rptr.3d 868], the court held that the public trust doctrine "has no direct application to groundwater sources," and that there was no evidence that a proposed extension of a water recycling program would affect the public's interest in a particular waterway. Neither case suggested that wildlife may not come within the protection of the public trust doctrine.

18, 2008].) Older decisions articulate this concept in property terms, as did the court in *Golden Feather Community Assn. v. Thermalito Irrigation Dist., supra,* 209 Cal.App.3d 1276. In *Ex parte Maier* (1894) 103 Cal. 476, 483 [37 P. 402], in upholding a prosecution for the violation of a statute prohibiting the sale of deer meat in California, even though the deer had been killed lawfully in another state, the California Supreme Court observed, "The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good." The United States Supreme Court subsequently cited this "well-considered opinion" in support of "[t]he common ownership, and its resulting responsibility in the State" over game (or, as described in the opinion, "animals ferae naturae"). (*Geer v. Connecticut* (1896) 161 U.S. 519, 527, 529 [40 L.Ed. 793, 16 S.Ct. 600], overruled in *Hughes v. Oklahoma* (1979) 441 U.S. 322 [60 L.Ed.2d 250, 99 S.Ct. 1727].)[14] After reviewing the history of laws controlling the taking of game, the court observed: "Whilst the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the State, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government, as distinct from the people, or for the benefit of private individuals as distinguished from the public good. Therefore, for the purpose of exercising this power, the State . . . represents its people, and the ownership is that of the people in their united sovereignty." (*Geer v. Connecticut, supra,* 161 U.S. at p. 529; see also, e.g., *Lacoste v. Dept. of Conservation* (1924) 263 U.S. 545, 549 [68 L.Ed. 437, 44 S.Ct. 186] ["The wild animals within its borders are, so far as capable of ownership, owned by the State in its sovereign capacity

---

[14] *Geer v. Connecticut, supra,* 161 U.S. 519, upheld against a challenge under the commerce clause of the federal Constitution a state statute prohibiting the out-of-state sale of game birds lawfully killed within the state, on the theory that such a restriction was justified by the state's ownership of the game. This holding was overruled in *Hughes v. Oklahoma, supra,* 441 U.S. 322, and, as discussed more fully in the text below, the fictional nature of the ownership theory was emphasized. "Although the state ownership doctrine enunciated in *Geer* was overruled in *Hughes v. Oklahoma,* the Supreme Court did not retreat from, but instead advanced the proposition that the state has a duty to exercise the legitimate state/public concerns for conservation, protection, and regulations of wildlife that underlie 'the 19th-century legal fiction of state ownership.' Speaking after *Hughes,* the United States District Court for the Eastern District of Virginia stated expressly, in a decision allowing the state to recover damages from a vessel owner for damage to migrating water fowl, 'Under the public trust doctrine, the State of Virginia and the United States have the right and the duty to protect and preserve the public's interest in natural wildlife resources. Such right does not derive from the ownership of the resources but from a duty owing to the people.' [(*Matter of Steuart Transp. Co.* (E.D.Va. 1980) 495 F.Supp. 38, 40).]" (Meyers, *supra,* p. 6, italics added, fns. omitted.)

for the common benefit of all of its people."]; *People v. Truckee Lumber Co., supra*, 116 Cal. at pp. 400–401 ["The dominion of the state for the purposes of protecting its sovereign rights in the fish within its waters, and their preservation for the common enjoyment of its citizens, is not confined within the narrow limits suggested by defendant's argument. It is not restricted to their protection only when found within what may in strictness be held to be navigable or otherwise public waters."]; *People v. Stafford Packing Co.* (1924) 193 Cal. 719, 725 [227 P. 485] ["the general right and ownership of fish is in the people of the state . . ."]; *People v. Monterey Fish Products Co.* (1925) 195 Cal. 548, 563 [234 P. 398]; *California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 629–630 [255 Cal.Rptr. 184]; *Betchart v. Department of Fish & Game* (1984) 158 Cal.App.3d 1104, 1106 [205 Cal.Rptr. 135]; *People v. Harbor Hut Restaurant* (1983) 147 Cal.App.3d 1151, 1154 [196 Cal.Rptr. 7].)

■ The ownership rationale employed in earlier cases has come to be recognized as a legal fiction. "The whole ownership theory . . . is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." (*Toomer v. Witsell* (1948) 334 U.S. 385, 402 [92 L.Ed. 1460, 68 S.Ct. 1156].) "The 'ownership' language . . . must be understood as no more than a 19th-century legal fiction expressing 'the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' " (*Douglas v. Seacoast Products, Inc.* (1977) 431 U.S. 265, 284 [52 L.Ed.2d 304, 97 S.Ct. 1740]; see *Hughes v. Oklahoma, supra*, 441 U.S. at pp. 334–335.) But, "while the fiction of state ownership of wildlife is consigned to history, the state's responsibility to preserve the public's interest through preservation and wise use of natural resources is a current imperative. In essence, the public trust doctrine commands that the state not abdicate its duty to preserve and protect the public's interest in common natural resources." (Meyers, *supra*, p. 10; see *Matter of Steuart Transp. Co., supra*, 495 F.Supp. at p. 40.)

Thus, whatever its historical derivation, it is clear that the public trust doctrine encompasses the protection of undomesticated birds and wildlife. They are natural resources of inestimable value to the community as a whole. Their protection and preservation is a public interest that is now recognized in numerous state and federal statutory provisions. (Fish & G. Code, § 711.7, subd. (a) ["The fish and wildlife resources are held in trust for the people of the state by and through the department [of Fish and Game]."]; *id.*, § 1600 ["The Legislature finds and declares that the protection and conservation of the fish and wildlife resources of this state are of utmost public interest. Fish and wildlife are the property of the people and provide a major contribution to the economy of the state, as well as providing a significant part of the people's food supply; therefore their conservation is a proper responsibility of

the state."]; *id.*, § 1801 ["It is hereby declared to be the policy of the state to encourage the preservation, conservation, and maintenance of wildlife resources under the jurisdiction and influence of the state. This policy shall include the following objectives: [¶] . . . [¶] (b) To provide for the beneficial use and enjoyment of wildlife by all citizens of the state. [¶] (c) To perpetuate all species of wildlife for their intrinsic and ecological values, as well as for their direct benefits to all persons. . . ."]; see also *id.*, §§ 1802, 2000, 2052, 3503.5, 3511, 3513, 3800, 12000; Pen. Code, § 597; Cal. Code Regs., tit. 14, §§ 472, 509; 16 U.S.C. §§ 668, 703; 50 C.F.R. §§ 10.13, 21.11, 22.11 (2008).)

■ In *Environmental Protection & Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459 [80 Cal.Rptr.3d 28, 187 P.3d 888] (*EPIC*), the California Supreme Court most recently referred to "two distinct public trust doctrines"—"the common law doctrine, which involves the government's 'affirmative duty to take the public trust into account in the planning and allocation of water resources' " and "a public trust duty derived from statute, specifically Fish and Game Code section 711.7, pertaining to fish and wildlife." (*Id.* at p. 515.) The court observed that "[t]here is doubtless an overlap between the two public trust doctrines—the protection of water resources is intertwined with the protection of wildlife." (*Ibid.*) The court also stated that "the duty of government agencies to protect wildlife is primarily statutory." (*Ibid.*) For purposes of deciding the issues presented in this case, it matters not whether the obligations imposed by the public trust are considered to be derived from the common law or from statutory law, or from both. Either way, public agencies must consider the protection and preservation of wildlife although, as the Supreme Court indicates, the contours of that obligation are, "[g]enerally speaking" (*ibid.*), defined by statute. What must be determined here is whether members of the public have the right to enforce that obligation and, if so, whether they may do so in an action against private parties who are adversely affecting trust property.

*Members of the public may enforce the public trust.*

■ In an oft-cited footnote in *National Audubon Society*, the Supreme Court reiterated that "any member of the general public . . . has standing to raise a claim of harm to the public trust," citing among other cases, *Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183 [161 Cal.Rptr. 466, 605 P.2d 1], in which the standing of a public interest organization was recognized. (*National Audubon Society, supra*, 33 Cal.3d at p. 431, fn. 11, citation omitted.) Nonetheless, defendants argue and the trial court held that the standing recognized by the Supreme Court applies only to actions to enforce "the traditional public trust interest in navigable and tidal waters and tidelands." The trial court observed that plaintiffs have

cited no cases in which private parties have been permitted to maintain an action for violation of the public trust doctrine arising from the destruction of wild animals. As the defendants argue and the trial court acknowledged, most of the cases recognizing wildlife as public trust property are actions brought by governmental agencies in the exercise of their police powers. In *People v. Truckee Lumber Co., supra*, 116 Cal. at page 398, for example, the court upheld an injunction obtained by the Attorney General, "in the name of the people," prohibiting a lumber company from polluting a nonnavigable stream and destroying the fish within it. *People v. Stafford Packing Co., supra*, 193 Cal. at page 724, which recognized the "necessity and importance of conserving the wild game and fish of this state for the benefit of the people of the state," was an action brought by the Attorney General to enforce statutory provisions limiting the amount of sardines that canning companies could use for reduction purposes. (See also, e.g., *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 937–938 & fn. 4 [63 Cal.Rptr.3d 50, 162 P.3d 569]; *People v. Perez* (1996) 51 Cal.App.4th 1168, 1177–1178 [59 Cal.Rptr.2d 596].)

While the trial court and defendants may be correct that the public trust over wildlife thus far has been enforced only in actions brought by public entities, there is no reason in principle why members of the public should be denied standing to maintain an appropriate action. The statement in *National Audubon Society* recognizing the standing of members of the public applied without qualification to "a claim of harm to the public trust." (*National Audubon Society, supra*, 33 Cal.3d at p. 431, fn. 11.) In *EPIC, supra*, 44 Cal.4th 459, the Supreme Court assumed the standing of two environmental organizations to challenge, under the public trust doctrine, the issuance by the Department of Fish and Game of a permit authorizing the incidental take of two bird species.[15]

■ The concept of a public trust over natural resources unquestionably supports exercise of the police power by public agencies. (E.g., *People v. K. Sakai Co.* (1976) 56 Cal.App.3d 531, 535–536 [128 Cal.Rptr. 536].) But the public trust doctrine also places a *duty* upon the government to protect those resources. "The heart of the public trust doctrine, however it may be articulated, is that it imposes limits and obligations on governments." (Wilkinson, *The Public Trust Doctrine in Public Land Law* (1980) 14 U.C. Davis L.Rev. 269, 284, fn. omitted.) "[T]he public trust is more than an affirmation of state power to use public property for public purposes. It is an affirmation of the duty of the state to protect the people's common heritage of

---

[15] The *EPIC* court held that the inclusion in the permit of a "no surprises clause[]" was a violation of the California Endangered Species Act (Fish & G. Code, § 2050 et seq.), not of "some general public trust duty," and it rejected the contention that other provisions of the permit violated a common law trust duty. (*EPIC, supra*, 44 Cal.4th at pp. 514–515.)

streams, lakes, marshlands and tidelands . . . ." (*National Audubon Society, supra*, 33 Cal.3d at p. 441.) "The state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*Id.* at p. 446.) In *National Audubon Society*, the court acknowledged that by statute this duty was placed upon the former Division of Water Resources with respect to the allocation of water rights, but explicitly observed that "[t]hese enactments do not render the judicially fashioned public trust doctrine superfluous. Aside from the possibility that statutory protections can be repealed, the noncodified public trust doctrine remains important both to confirm the state's sovereign supervision and to require consideration of public trust uses in cases filed directly in the courts without prior proceedings before [the Division of Water Resources]." (*Id.* at p. 446, fn. 27.)

The interests encompassed by the public trust undoubtedly are protected by public agencies acting pursuant to their police power and explicit statutory authorization. Nonetheless, the public retains the right to bring actions to enforce the trust when the public agencies fail to discharge their duties. Many of the cases establishing the public trust doctrine in this country and in California have been brought by private parties to prevent agencies of government from abandoning or neglecting the rights of the public with respect to resources subject to the public trust. (E.g., *Illinois Central Railroad v. Illinois* (1892) 146 U.S. 387 [36 L.Ed. 1018, 13 S.Ct. 110]; *City of Berkeley, supra*, 26 Cal.3d 515.) The facts involved in *National Audubon Society* illustrate that public agencies do not always strike an appropriate balance between protecting trust resources and accommodating other legitimate public interests; indeed, as in that case, the protection of the trust resources may be entirely ignored. The suggestion that members of the public have no right to object if the agencies entrusted with preservation of wildlife fail to discharge their responsibilities is contrary to the holding in *National Audubon Society* and to the entire tenor of the cases recognizing the public trust doctrine.[16]

---

[16] The right of public members to hold the government to its responsibility to protect the public trust finds ample support in the academic literature. (E.g., Reitze, Environmental Law (2d ed. 1972) ch. 5, p. 32 ["The public trust doctrine holds that the government has a duty to all citizens to protect the Nation's natural resources for them as their trustee. If the government does not act to protect these resources as a trustee a court action may be instituted by a citizen."]; Carstens, *The Public Trust Doctrine: Could a Public Trust Declaration for Wildlife Be Next?* (2006) vol. 2006, No. 9, Cal.Envtl. L.Rptr. 1 ["the Public Trust Doctrine is a critically important reminder of the duty of government to preserve wildlife to protect the public's right to enjoy and benefit from a diverse ecosystem and the duty of courts to carefully scrutinize any attempts to abandon the public trust in those resources"]; Berlin et al., *Law in Action: The Trust Doctrine* in Law and the Environment (Baldwin & Page edits., 1970) pp. 169, 171, 177 (Berlin, *Law in Action*); Cohen, *The Constitution, The Public Trust Doctrine,*

*A claim for breach of the public trust must be brought against the responsible public agencies.*

We thus reject the conclusion of the trial court that private parties may not invoke the public trust doctrine "beyond the traditional public trust interest in navigable and tidal waters and tidelands." That is not to say, however, that plaintiffs are entitled to maintain this action in the manner they have framed it. The defect in the present complaint is not that it seeks to enforce the public trust, but that it is brought against the wrong parties. Plaintiffs have brought this action against the windmill operators whose actions they allege are destroying natural resources protected by the public trust. Plaintiffs have not proceeded against the County of Alameda, which has authorized the use of the wind turbine generators, or against any agency such as California's Department of Fish and Game that has been given the statutory responsibility of protecting the affected natural resources.[17] When the trial court indicated its intention to grant judgment on the pleadings and dismiss the action, no request was made for leave to amend to state a claim against any such party.

■ Under traditional trust concepts, plaintiffs, viewed as beneficiaries of the public trust, are not entitled to bring an action against those whom they allege are harming trust property. The trustee charged with the responsibility to implement and preserve the trust alone has the right to bring such an action. (*Saks v. Damon Raike & Co.* (1992) 7 Cal.App.4th 419, 427 [8 Cal.Rptr.2d 869]; 13 Witkin, Summary of Cal. Law (10th ed. 2005) Trusts, § 149, pp. 711–712.) "[W]here a trustee cannot or will not enforce a valid cause of action that the trustee ought to bring against a third person, a trust beneficiary may seek judicial compulsion against the trustee. In order to prevent loss of or prejudice to a claim, the beneficiary may bring an action in equity joining the third person and the trustee." (*Saks v. Damon Raike & Co., supra,* at pp. 427–428; see 13 Witkin, Summary of Cal. Law, *supra,* § 149, p. 712.) Thus, analogizing this action to the enforcement of a traditional trust agreement, the action must be brought against the appropriate representative of the state as the trustee of the public trust. (See also, e.g., *Pillsbury v. Karmgard* (1994) 22 Cal.App.4th 743, 756–758 [27 Cal.Rptr.2d 491]; Berlin, *Law in Action, supra,* at pp. 177–178.)

---

*and the Environment* (1970) 1970 Utah L.Rev. 388, 392 ["The failure to carry out the obligations of the trust amounts to a breach of constitutionally protected rights which no court can permit."].)

[17] Fish and Game Code section 1802 provides: "The [Department of Fish and Game] has jurisdiction over the conservation, protection, and management of fish, wildlife, native plants, and habitat necessary for biologically sustainable populations of those species. The department, *as trustee for fish and wildlife resources,* shall consult with lead and responsible agencies and shall provide, as available, the requisite biological expertise to review and comment upon environmental documents and impacts arising from project activities, as those terms are used in the California Environmental Protection [*sic*] Act (Division 13 (commencing with Section 21000) of the Public Resources Code)." (Italics added.)

■ The necessity for proceeding against the appropriate public agencies is supported by more than analogy. As many of the references to the public trust doctrine cited above make clear, the doctrine places on the state the responsibility to enforce the trust. If the appropriate state agencies fail to do so, members of the public may seek to compel the agency to perform its duties, but neither members of the public nor the court may assume the task of administering the trust. When the Supreme Court decided in *National Audubon Society* that the Department of Water and Power of the City of Los Angeles had been permitted by the former state Division of Water Resources to appropriate waters from the Mono Basin without regard to adverse impacts on Mono Lake and related environmental concerns, the remedy prescribed was not an injunction against the department's use of the water, nor was it an award of restitution or a declaratory judgment establishing an acceptable level of water appropriation. The court held that "some responsible body" should reconsider the allocation of the water rights involved, taking into account both the need for use of the water in Los Angeles and "the impact of water diversion on the Mono Lake environment." (*National Audubon Society, supra,* 33 Cal.3d at pp. 447–448.) Because of the complexities of water law and water policy, and the need for expertise to appropriately balance the conflicting needs for use of the water, the court considered whether exclusive primary jurisdiction to make such a determination should be deemed conferred on the Division of Water Resources. However, the court read the particular statutory provisions relating to water rights to confer concurrent original jurisdiction on the courts to determine those rights. The Supreme Court ruled that "[t]he court, however, need not proceed in ignorance, nor need it invest the time required to acquire the skills and knowledge the board already possesses. When the case raises issues which should be considered by the board, the court may refer the case to the board. Thus the courts, through the exercise of sound discretion and the use of their reference powers, can substantially eliminate the danger that litigation will bypass the board's expert knowledge and frustrate its duty of comprehensive planning." (*Id.* at p. 451.)

The amended complaint in this case is just such an attempt to "bypass" the expertise that has been brought to bear on the subject in the permit proceedings before the Alameda County authorities. As recited more fully above, in considering the applications to extend the conditional use permits, the county received input from a specially created Wind Power Working Group that included representatives from California's Department of Fish and Game and the United States Fish and Wildlife Service, and from the California Energy Commission, the California Attorney General, expert consultants and others. The extended permits were granted subject to additional conditions designed to reduce avian mortality, and further measures are contemplated to study and to improve the mitigation measures in the future. Although other public interest

groups dissatisfied with the action taken by the Alameda County Board of Supervisors filed petitions for a writ of mandate challenging that action—and that litigation has been settled by the inclusion of additional conditions in the conditional use permits issued to certain of the defendants (see fn. 11, *ante*)—plaintiffs filed no writ proceedings and did not proceed against any of the public agencies in this action.

As indicated above, plaintiffs have the right to insist that the state, through its appropriate subdivisions and agencies, protect and preserve public trust property, including raptors and other wildlife. We have no occasion here to address the responsibilities that sundry agencies bear in this regard, whether such obligations be imposed by statute or by common law. As with the water rights that were involved in *National Audubon Society,* the environmental values protected by the public trust doctrine "deserve to be taken into account. Such [human and environmental] uses should not be destroyed because the state mistakenly thought itself powerless to protect them." (*National Audubon Society, supra,* 33 Cal.3d at p. 452.) However, these are not the only interests that must be considered. A delicate balancing of the conflicting demands for energy and for the protection of other environmental values must be made. "[T]he public trust permits—indeed requires—the balancing of competing uses." (Stevens, *The Public Trust: A Sovereign's Ancient Prerogative Becomes the People's Environmental Right* (1980) 14 U.C. Davis L.Rev. 195, 224.)

There unquestionably is a strong public interest in utilizing wind power as a source of energy. Since 1980 there has been a federal Wind Energy Systems Act of 1980 (42 U.S.C. § 9201 et seq.) designed to foster the development of wind power. Congress has declared that "the widespread use of wind energy systems to supplement and replace conventional methods for the generation of electricity and mechanical power would have a beneficial effect upon the environment." (42 U.S.C. § 9201(a)(9).) The Altamont Pass Wind Resource Area has been so designated by the California Energy Commission, consistent with this federal legislation and with the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. § 2601 et seq.). The California Legislature has promulgated a "California Renewables Portfolio Standard Program" requiring investor-owned utilities and competitive retail suppliers to derive 20 percent of their retail sales from renewable energy by 2010 (Pub. Util. Code, §§ 399.11, 399.15, subd. (b)(1)) and the California Energy Commission has adopted the goal of meeting this requirement by 2010. (Cal. Energy Com., 2003 Integrated Energy Policy Rep., p. viii.) Consistent with these federal and state objectives, the East County Area Plan for Alameda County states as a "Windfarms Goal: To maximize the production of wind generated energy"

and as a policy, to "recognize the importance of windpower as a clean, renewable source of energy."[18] (Boldface omitted.)

The Alameda County Board of Supervisors, with the advice and cooperation of numerous other agencies, has attempted to strike a balance between the generation of clean renewable energy with wind turbines and the protection of raptors and other birds adversely affected by the turbines. A challenge to the permissibility of defendants' conduct must be directed to the agencies that have authorized the conduct.[19] If plaintiffs believe that the board of supervisors or any other agency or subdivision of the state has failed to discharge its responsibilities under the public trust, they may bring an appropriate action against those agencies.[20] The defendants who have been authorized to carry on the activities that plaintiffs contend should be

---

[18] Other policies included in the plan are to "allow for continued operation, new development, redevelopment, and expansion of existing and planned windfarm facilities within the limits of environmental constraints," to "work with the wind energy industry, public utilities, other agencies, and energy experts to monitor trends in wind energy developments, technology, and environmental safeguards," and to "establish a mitigation program to minimize the impacts of wind turbine operations on bird populations." The plan also provides that the county "shall work with other agencies (federal, state, and local) to establish feasible mitigation for avian collisions with wind turbines. The County will take a lead role with windfarm operators and other agencies in developing and managing a Mitigation Monitoring Program in the Wind Resource Area." (East County Area Plan (2000) pp. 43–44, boldface omitted.) The Contra Costa County General Plan states as a goal, "To encourage the use of renewable resources where they are compatible with the maintenance of environmental quality."

[19] At oral argument plaintiffs' counsel seemed to suggest that the absence of legislation explicitly delegating to the counties the responsibility for enforcing the public trust over birdlife means that the Alameda County Board of Supervisors cannot be held accountable for authorizing conduct unjustifiably detrimental to these natural resources. However, the county, as a subdivision of the state, shares responsibility for protecting our natural resources and may not approve of destructive activities without giving due regard to the preservation of those resources. Indeed, independent of the common law public trust doctrine, CEQA provides that it is the policy of the state to "[p]revent the elimination of fish or wildlife species due to man's activities, [and] insure that fish and wildlife populations do not drop below self-perpetuating levels" (Pub. Resources Code, § 21001, subd. (c)), and that the Legislature intends "that all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian" (*id.*, § 21000, subd. (g)). If there are feasible alternatives or feasible mitigation measures that would accomplish most of the objectives of a project and substantially lessen the significant environmental effects of a project subject to CEQA, the project may not be approved without incorporating those measures. (Pub. Resources Code, § 21002; Cal. Code Regs., tit. 14, § 15091.)

[20] See, for example, *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1306, footnote 5 [64 Cal.Rptr.3d 250]: "Nothing in this opinion is intended to preclude plaintiff from pursuing appropriate writ relief pursuant to the Code of Civil Procedure to compel the DHCS to adopt regulations . . . ."

prohibited may well be proper parties in such proceedings. But there is no basis for recognizing an action that is not directed against the appropriate state agency responsible for authorizing the wind farm operations.

Even if the court were to recognize a theoretical cause of action on behalf of the public against the wind farm operators, it would be appropriate for the court to abstain from adjudicating it in deference to the regulatory oversight being provided by public authorities. The specification of conditions best designed to accommodate the conflicting environmental and energy concerns presented by the operation of wind turbines is both highly complex and value laden. Expertise from many disciplines is necessary to evaluate a myriad of alternatives and must be brought to bear in striking a reasonable balance. Moreover, it is apparent that we are still on the upward slope of the learning curve in generating energy by the use of wind power.[21]

Intervention by the courts, other than by exercising oversight over the administrative process and ensuring that proper standards are applied, not only would threaten duplication of effort and inconsistency of results, but would require the courts to perform an ongoing regulatory role as technology evolves and conditions change. All of these factors call for abstention. "It is well established that a court of equity will abstain from employing the remedies available under the unfair competition law in appropriate cases. As the Court of Appeal held in a case involving the health care finance industry: '[B]ecause the remedies available under the [unfair competition law], namely injunctions and restitution, are equitable in nature, courts have the discretion to abstain from employing them. Where [an unfair competition law] action would drag a court of equity into an area of complex economic [or similar] policy, equitable abstention is appropriate. In such cases, it is primarily a legislative and not a judicial function to determine the best economic policy.'" (*Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 641–642 [39 Cal.Rptr.3d 62], quoting *Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 795–796 [114 Cal.Rptr.2d 623]; see also, e.g., *Alvarado v. Selma Convalescent Hospital, supra,* 153 Cal.App.4th at pp. 1298–1306.)

Although most of these recent abstention cases involve claims asserted under the UCL, the considerations militating for abstention that are elaborated in these opinions are equally applicable in this case. "Judicial abstention is appropriate when granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere

---

[21] In briefing to this court defendants point out numerous and often inconsistent mitigation measures that have been tried over the years and often abandoned, including "perching guards," "rodent control," "allowing grass around turbines to grow tall so that small mammals would be less visible to raptors," and seasonal shutdown of "high risk" turbines.

with the functions of an administrative agency." (*Alvarado v. Selma Convalescent Hospital, supra*, 153 Cal.App.4th at p. 1298.) In *Shamsian v. Department of Conservation, supra*, 136 Cal.App.4th at page 642, the court observed that "the complex statutory arrangement of requirements and incentives involving participants in the beverage container recycling scheme is to be administered and enforced by the department consistent with the Legislature's goals. For the court at this point to issue restitution and disgorgement orders against the corporate defendants would interfere with the department's administration of the act and regulation of beverage container recycling and potentially risk throwing the entire complex economic arrangement out of balance. The public's need for opportunities to recover its cash redemption value funds and to conveniently recycle its beverage containers is not so great as to warrant judicial interference in the administrative scheme designed to address those needs at this point."

■ Plaintiffs here are attempting to challenge the authorization to operate wind turbines granted by the county without bringing an action against the county. Given the impact that a ruling on the merits could have on the ability of the county to accomplish its policy objectives, and the potential for the pronouncement of inconsistent standards and conditions for the operation of the turbines, the county unquestionably is a necessary party to the action. (Code Civ. Proc., § 389, subd. (a).) Since the proper method of challenging the issuance of conditional use permits is by writ of administrative mandate (*Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 111 [99 Cal.Rptr.2d 378]), the time for filing of which has long passed (Code Civ. Proc., § 1094.6, subd. (b)), it is now too late for an action against the county to set aside the conditional use permits that have already been issued. The dismissal of the action, therefore, also may be justified by the absence of a necessary and indispensable party. (Code Civ. Proc., § 389, subd. (b); *Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564 [106 Cal.Rptr.2d 14]; Berlin, *Law in Action, supra*, at p. 178.)

We do not gainsay plaintiffs' concern for the protection of the raptors and other birds that are suffering in large numbers from the operation of the wind turbines in the Altamont Pass. However, it is apparent that the responsible public agencies have not ignored this concern and are attempting to mitigate the harm to birdlife by imposing appropriate conditions and restrictions on the operation of the turbines. We are in no position at this time and on this record to pass judgment on the sufficiency of those efforts or to express any opinion as to whether the public trust over these natural resources is being adequately enforced. What we do say is that any challenge to the adequacy of the measures being taken must be addressed in an appropriate manner to the agencies that are responsible for regulating those activities. The courts are available to review the responses of those agencies, but they are not available to supersede their role in the regulatory process.

## Disposition

The judgment is affirmed.

McGuiness, P. J., and Siggins, J., concurred.

A petition for a rehearing was denied October 9, 2008, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied December 23, 2008, S167578. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.