Filed 10/6/23  White v. California Department of Forestry CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARIBETH MERCADO WHITE,<br>    Plaintiff and Appellant,<br>v.<br>CALIFORNIA DEPARTMENT OF FORESTRY,<br>    Defendant and Respondent. | A162967, A162978<br><br>(Mendocino County Super. Ct. Nos. SCTMCVG1769676 & SCTMCVG2074570) |
| MARIBETH MERCADO WHITE,<br>    Plaintiff and Appellant,<br>v.<br>CALIFORNIA STATE LANDS COMMISSION et al.,<br>    Defendants and Respondents. | A165182<br><br>(Mendocino County Super. Ct. No. 21-CV00686) |

This consolidated appeal is from three judgments in lawsuits (commenced in 2017, 2020, and 2021) by plaintiff and appellant Maribeth Mercado White.  The trial court ruled that most of the causes of action in these lawsuits are barred under preclusion doctrines (res judicata and collateral estoppel) given a judgment against White in a 2010 lawsuit and a 2012 writ proceeding.  The court dismissed the remainder of the causes of action for various other reasons.  The cases all arise out of White's dispute with defendants over her ability to access property she owns by way of an old, unpaved logging road on state forest land the Department of Forestry and

1

Fire Protection (CalFire) is in the process of closing.  We affirm the judgments.

BACKGROUND

### The 2010 Lawsuit and 2012 Mandamus Proceeding

In March 2010, White sued the Director of CalFire and the California Board of Forestry,[1] alleging causes of action for quiet title, reformation of deed, inverse condemnation, and declaratory and injunctive relief.

White alleged the following "[r]elevant" facts in support of her claims:

The lawsuit "concern[ed] a forty-acre parcel" bounded on three sides by the Jackson Demonstration State Forest (the state forest).[2]  (Boldface omitted.)  The parcel was conveyed by the state to White's predecessor in interest in the late 1940's.  "For all known and documented time," the parcel was accessed through a road that traverses the state forest land.  Forestry personnel "first became aware" there was no "legal documentation" of any right of access over the forest land in 1981, when Pacific Telephone asked about installing an underground telephone cable.  The issue of access "surfaced again" in 1983, when the brother of White's first and now deceased husband sought a permit for approval of an illegal structure on the property.  The then forest manager suggested it was an "appropriate time" to "obtain formal written legal access" and said he would assist White's predecessor in

---

[1] She alleged the Board of Forestry is an appointed body under the auspices of CalFire that develops "general forest policy" and "guidance policies," which are implemented by CalFire.

[2] Demonstration state forests, in contrast to the "majority of public wildlands," "are public lands that by legislative mandate have a unique and distinctly different purpose from parks and wilderness areas.  Demonstration State Forests are mandated to conduct research, demonstration, and education on sustainable forestry practices using active forest management, including periodic timber harvests."

2

doing so. "For unknown reasons, the parties did not complete the transaction." More than 10 years later, in 1994, the then new forest manager, "threaten[ed] to permanently close the roadway." The issue was not "formally resolved," but "access was not denied."

Some 12 years later, in 2006, White "reopened the discussion as to formalizing access," indicating she was "willing to actively engage in a process that would resolve matters with a formal deeded easement." Between November of that year and April 2008, "a number of meetings and on-site visits" took place to consider alternative access not on the state forest land, "as that was the preferred resolution for all parties." However, no "economically and environmentally feasible alternative routes" were found.

In June 2008, White sought to involve CalFire's general counsel. In August, he "indicated" she did not need to be concerned about access to her parcel and the issue of an easement was being studied "in light of the Board[ of Forestry's] policies."

In August 2009, White submitted a formal written request to the Board of Forestry seeking a deeded easement. The Board of Forestry denied the request in March 2010. The action resulted in White being denied refinancing and impairment of the marketability of her property.

White further alleged Board of Forestry policy 0351.8 allows the Board of Forestry to grant easements and states easements are " 'sometimes necessary to allow adjacent owners access, use[,] and development of their property.' " It also states requests for easements are " 'discouraged' " but they " 'may be considered when no other routing through non-State forest land is physically possible or if such other routing presents substantial and unreasonable difficulties or environmental damage.' " It additionally states " 'an effort will be made to formalize by agreement, any prescriptive rights to

3

State forest roads which adjacent owners may have acquired through uncontested use.' "

Her first cause of action, for quiet title, asserted White and her predecessors "either own the roadway at issue or have established their right to an easement . . . based on implication, necessity or prescription, or as a matter of equity including collateral estoppel." Her second cause of action sought reformation of the "original deed" from the state to her predecessor in interest. Her third cause of action, for inverse condemnation, asserted the Board of Forestry's "arbitrary refusal" to grant her a deeded easement violated its policies and so affected the value of her property "to render it near worthless and deprived [her] of the ability to sell [it] and even to obtain loan[s]." Her fourth and fifth causes of action sought declaratory and injunctive relief, respectively.

In June 2010, White filed a first amended complaint that added causes of action for slander of title, breach of contract, interference with prospective economic advantage, and state and federal due process violations. CalFire interposed a demurrer, which was sustained without leave to amend as to all causes of action except for quiet title and declaratory relief.

White filed a second amended complaint in February 2011. Her allegations of "[r]elevant" facts essentially remained the same, but she augmented the allegations of her quiet title claim and added a cause of action for mandamus relief. (Boldface omitted.)

As to quiet title, White additionally alleged her right to use the road was "based on a claim of necessity that is implied from the fact [the state] was the common owner of plaintiff's parcel" and the state forest land surrounding the parcel on three sides, and the state, "as common owner, intended to convey whatever was necessary for the beneficial use of plaintiff's

parcel." She further alleged her property is "effectively landlocked in that alternate access is impossible because access across the only adjoining private property has been refused," and even if granted, would not be feasible because building a road was prohibitively expensive and would result in "serious environmental damage." Given the alleged environmental damage, Board of Forestry policy assertedly directed that the Board of Forestry "should consider granting a permanent easement." Her claim was "based additionally on principles of equity, including equitable estoppel and promissory estoppel," and she and her predecessors had "relied to their detriment on assurances made over the years and up until recently that defendants would provide a deeded easement." She further alleged her predecessors in interest had obtained a prescriptive right to the portion of the road that had once been on private property that was later conveyed to the state.

As to mandamus relief, White alleged the defendants had acted "arbitrarily and capriciously . . . in their application of state law and [Board of Forestry] Policy 0351.8 by refusing to grant [her] a deeded easement to her property."

In September 2012, White filed a separate mandamus action against CalFire and its director. White alleged that the preceding April, the director had authored a letter denying her request for an easement but stating CalFire would continue to allow use of the road. At some point, CalFire offered to enter into a use agreement limited to White and not applicable to successors-in-interest.

The following year, in December 2013, the trial court denied her writ petition, ruling CalFire was under no mandatory duty to grant White an

5

easement and the director had not abused his discretion in refusing to approve one.

White's quiet title and declaratory relief claims in her lawsuit came on for trial the following month, and in July 2014, the court issued a nine-page decision, ruling White had failed to establish that any of the three factors relevant to an "equitable" easement weighed in her favor.[3] As White observes in her briefing in the instant appeal, the trial court found two of the factors—whether CalFire would suffer irreparable injury and whether denial of an easement would cause White disproportionate hardship—did not weigh in her favor given CalFire's assurance it would not deny White access. "Her access to the property, so long as she cooperates in protecting the public lands against various trespasses, is guaranteed."

White appealed the adverse judgments in both her lawsuit and mandamus action. This court affirmed.

With respect to her quiet title/equitable easement claim, we concluded the trial court properly ruled White had not established that any of the three factors required to establish an equitable easement weighed in her favor,

---

[3] To support an equitable easement, three factors must be present: First, the easement seeker must use and improve the property innocently— " '[t]hat is, his or her encroachment must not be willful or negligent.' " (*Tashakori v. Lakis* (2011) 196 Cal.App.4th 1003, 1009 (*Tashakori*).) A court " "should consider the parties' conduct to determine who is responsible for the dispute.' " (*Ibid*.) Second, the easement opponent will not suffer irreparable harm by its creation. Third, the hardship of denying the easement " ' "must be greatly disproportionate to the hardship" ' " of allowing it. (*Ibid*.) "Unless all three prerequisites are established, a court lacks the discretion to grant an equitable easement." (*Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 19.) Moreover, "courts approach the issue of equitable easements with '[a]n abundance of caution' [citation], and resolve all doubts against their issuance." (*Id*. at p. 21.)

6

including the first factor pertaining to whether use of the road was "innocent" and not willful or negligent. In that regard, we stated:

> "[T]he trial court found the Whites did not have 'a good faith belief, based on a diligent investigation, that they had unfettered rights to use the roadway.' Specifically, there was no evidence that anyone in the chain of title to plaintiff's parcel had ever been misled as to the absence of a right of access. Importantly, Robert [White] testified at trial that he knew the parcel had no recorded access at the time he examined the deed, and acknowledged that he had likely discussed this point with his brother William [White], plaintiff's husband. The court imputed William's knowledge to plaintiff, and she does not challenge this aspect of the court's ruling on appeal. The instant case is thus distinguishable from *Tashakori, supra,* 196 Cal.App.4th at page 1006, in which the easement seekers were reasonably misled into believing they already had a recorded easement for use of a neighbor's driveway. Accordingly, that case does not undercut the trial court's findings here."

We went on to state that "[w]hile plaintiff's failure to surmount this first hurdle is dispositive," the trial court's findings as to the relative hardships to the parties were also supported by substantial evidence.

### The 2017 Lawsuit

Two years after the judgments in the 2010 lawsuit and 2012 mandamus action were affirmed, White filed a new lawsuit against CalFire, the Board of Forestry, and several individuals, including the then manager of the state forest.

Many of the "[r]elevant" facts White alleged were identical to those alleged in her original and amended complaints in her 2010 lawsuit. (Boldface omitted.) New allegations included the following:

7

Her property was once owned by the federal government, which passed title to the state for use as an educational site, and "there was an implied condition that access accompany the property so that the property may house a school" and students could have access. The state "elected not to use the parcel in this manner," instead selling it to White's predecessor-in-interest. In March 2010, White had filed suit "to obtain a judicial order granting an easement or similar form of security involving access." That case was tried, relief was denied, and the Court of Appeal affirmed in 2015. In August 2017, the then forest manager notified White that she (the manager) "was ordering" the road "decommissioned and closed effective October 1, 2017," and offered White "a one-year, non-renewable access agreement to defer the closure for twelve months." White asked to see the document, but the manager never provided it, "merely indicat[ing] it was a limited use agreement that differed from that previously offered" to White during the prior lawsuit. The manager further told White the new offer would expire within two weeks if not accepted. White refused the offer because use was limited to one year.

White asserted fourteen causes of action: (1) "Breach of Implied Use Agreement & Promissory Estoppel"; (2) "Equitable Easement or Permanent Use Agreement"; (3) "Taking of Property (Inverse Condemnation)"; (4) "Interference with Prospective Economic Advantage"; (5) intentional "Infliction of Emotional Distress"; (6) "Violation of Substantive Due Process & Equal Protection"; (7) "Civil Rights Violations"; (8) "Civil Conspiracy"; (9) "Private Nuisance & Loss of Quiet Enjoyment"; (10) "Defamation"; (11) "Violation of CEQA and JDSF Management Plan (FEIR)"; (12) "Waste of Public Funds (Taxpayer Claim)"; (13) "Violation of Public Records Act"; and (14) "Declaratory Relief." (Boldface omitted.)

8

Two years later, in December 2019, White filed a second amended complaint, adding as defendants the then new forest manager, the deputy director for resource management for the state forest, and the deputy attorney general who had been representing the defendants. White also added the following alleged "[r]elevant" facts:

In January 2018, the parties "reached an interim settlement agreement" that "[e]nsured continued access" to the parcel until "at least September 2018." (Boldface omitted.) The terms provided CalFire "would continue to negotiate in good faith an access agreement" and the agreement "could be extended" beyond September 2018. Negotiations took place during the late February through April 2019 time frame. It appeared to White's attorney that the "access issues had been working out," and he told the deputy attorney general handling the case for CalFire that litigation would be necessary only if " 'CDF unilaterally and without cause or notice decided to bar access.' " The deputy attorney general "avoided direct responses, offering no clue that plans were under way to close the road." But in fact, CalFire "staff" had, in February, filed a Notice of Exemption (NOE) under CEQA to "decommission[]" a number of "unused or abandoned logging roads," including the road at issue. Despite knowing White had a "strong interest" in any such action, she was not given notice of the filing of the NOE. In mid-June, the new forest manager gave White 60 days' notice of decommissioning.

White alleged twelve causes of action: (1) "Breach of Implied Use Agreement & Promissory Estoppel"; (2) "Equitable Easement or Permanent Use Agreement"; (3) "Taking of Property (Inverse Condemnation)"; (4) "Interference with Prospective Economic Advantage"; (5) "Violation of Substantive Due Process & Equal Protection"; (6) "Civil Rights Violations"; (7) "Civil Conspiracy"; (8) "Defamation"; (9) "Violation of CEQA and JDSF

9

Management Plan (FEIR)"; (10) "Waste of Public Funds (Taxpayer Claim)"; (11) "Violation of Public Records Act"; and (12) "Declaratory Relief."

Defendants interposed a demurrer seeking the dismissal of all individually named defendants and dismissal of the third through eleventh causes of action as against all defendants.

The trial court sustained the demurrer without leave to amend as to the individual defendants on multiple grounds—there were no allegations these individuals had acted outside the scope of their official capacity, there were no allegations these individuals owed any duty to White they had not performed, and there were no allegations these individuals held any right, title, or interest in the property, or any right to control the disposition thereof. Further, the deputy attorney general was protected by the litigation privilege set forth in Civil Code section 47, and the originally named forest manager no longer worked for CalFire.

As to CalFire and the Board of Forestry, the court sustained the demurrer without leave to amend as to all causes of action except the first, second, and twelfth causes of action on a variety of grounds. Because it had been adjudged that White had no easement over the access road, she had no property that had been "taken" for purposes of inverse condemnation. All her causes of action seeking damages were barred for failure to file a claim in accordance with the Government Claims Act (Gov. Code, § 810 et seq.). Her substantive due process claim was conclusory and not based on the termination or revocation of any existing property interest created by an independent source. She was barred from pursuing civil rights claims against the state, its agencies, and its officials acting in their official capacities. She failed to timely request a hearing on her CEQA claim. Her claim for waste of public funds was speculative and she had failed to exhaust

10

administrative and judicial remedies, including filing a timely petition for writ of mandate.  Her public records claim was moot because the records had been produced.

White moved for reconsideration, which in large part was a request for leave to further amend.  The trial court denied the motion both because White failed to make the showing required by Code of Civil Procedure section 1008 and because her proposed amendments did not cure the deficiencies of her causes of action.

CalFire and the Board of Forestry then moved for summary judgment on White's remaining claims for "breach of implied use agreement and promissory estoppel," "equitable easement or permanent use agreement," and declaratory relief on res judicata grounds and the merits.

The trial court granted the motion, first summarizing the "long and convoluted history" of White's effort to establish "a right of access" through the forest land.[4]  As to what followed this Court's affirmance of the judgments against her in her 2010 lawsuit and 2012 writ proceeding, the trial court stated:

> "After the Court of Appeal decision, CALFIRE attempted to formalize Ms. White's use of the road through a use agreement. CALFIRE sent a letter in June 2017, which was ignored.  After CALFIRE did not receive a response to that letter, and a private equipment operator hired by Ms. White did work on state property without any authorization, CALFIRE notified Ms. White of its plan to decommission the access road.  The parties agreed to a stay of the case

---

[4]  The court expressly granted the defendants' request for judicial notice filed on October 1, 2020, and implicitly granted their supplemental request filed January 19, 2021.

11

at that time, in order to give Ms. White time to find a buyer.  CALFIRE proposed a use agreement to one potential buyer.  The potential buyer decided not to negotiate or enter into the proposed use agreement.  Until at least mid-September 2020, no other potential buyer has approached CALFIRE about access to this property.

"In 2019, CALFIRE again gave notice that it would decommission the road.  CALFIRE explained that the road is no longer needed for forest management purposes.  The Court has issued a preliminary injunction, preserving the status quo while the merits of the case are resolved.

"Ms. White has recently filed yet another action, against CALFIRE and two neighbors, raising the same issues."

The court went on to rule that all three causes of action were barred by res judicata, concluding the "primary right" that has been at issue in all her claims is her asserted right of access through the state forest land.  It expressly rejected White's assertion that a new primary right was at issue because CalFire had assertedly "change[d]" its position on access and was now moving to preclude it.  All of White's "claimed harms," said the court, "are because she does not have legal access to her property," and all of the causes in her first lawsuit also "relate[d] back to the issue of access."  "The different legal theories now advanced by Ms. White are still based on the central claim of road access to her property."

The court similarly rejected White's assertion that res judicata was not a bar because "the facts have materially changed" given CalFire's decommissioning of the road.  CalFire "never promised it would allow plaintiff to use the road for all time," and White, herself, averred in a declaration she "did not believe any 'claim that CDF does not intend to

12

prevent my use of the road.' " The court also pointed out neither it, nor the Court of Appeal, had relied on assurances of permanent access by CalFire in previously rejecting her equitable claim for an easement. Furthermore, neither White, nor her predecessors, were "mislead" that CalFire would provide permanent access.

While the trial court pointed out its res judicata ruling was dispositive as to the remaining causes of action, it also agreed with defendants' alternative argument as to the first cause of action—that it was essentially a contract claim and White had identified no contractual authority in defendants to enter into the asserted permanent use agreement.[5]

White filed a notice of appeal. (Appeal No. A162967.)

***The 2020 Lawsuit***

In the meantime, White and her tenant (collectively, White) had filed a third lawsuit (fourth if you include her prior mandamus proceeding), naming as defendants CalFire and the individual owners of the two adjacent, privately held parcels. She largely asserted the same "[r]elevant" facts alleged in her prior lawsuits, emphasizing there was no feasible means of access across the two privately owned parcels and both owners had refused to provide her with access. (Boldface omitted.) She asserted five causes of action: (1) "Hinrichs-Linthicum action to establish right of access"[6] on the ground her property was "landlocked"; (2) "public and private nuisance" on the ground that by closing the access road CalFire was creating both a public

---

[5] The court also denied White's purported cross-motion for summary judgment on the ground it was moot and procedurally deficient in numerous respects.

[6] This cause of action was based on *Hinrichs v. Melton* (2017) 11 Cal.App.5th 516 (*Hinrichs*) and *Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259 (*Linthicum*).

and private fire and emergency hazard; (3) "intentional & reckless endangerment to health & safety" on the ground closure of the road created "an unreasonable risk of physical and psychological harm to" to White and the "public living in the vicinity"; (4) "good faith improver of property" on the ground White and her predecessors had made substantial improvements to the roadway; and (5) declaratory relief. (Capitalization & boldface omitted.)

White subsequently filed a second amended complaint, largely reiterating the allegations she had made in her 2017 lawsuit and adding the California Public Works Board as a defendant.[7] She added the following new "[r]elevant" factual allegations (boldface omitted):

That after obtaining a preliminary injunction in her 2017 lawsuit, she began improving her property and seeking new buyers, "confident" CalFire would grant a road use permit like the one it had offered to her in 2014 and to a prior prospective buyer in 2018. But "numerous prospective buyers" either "lost interest" after being told there was no "clear access" right or "withdrew their purchase offers" when CalFire "refused" to talk with them about obtaining a right of access. Eventually, White's tenant expressed a desire to purchase if CalFire would provide access. While White needs access to her property, CalFire allegedly offered "no reason for decommissioning" the road.

White now asserted eight causes of action: (1) "Hinrichs-Linthicum action to establish right of access"; (2) "fraudulent or negligent land transfers and non-disclosure by State of California" on the ground that in acquiring the surrounding parcels and in selling the parcel at issue, the state had not

_____

[7] White alleged the Public Works Board oversees the fiscal matters associated with state construction projects and in 1968 conveyed the state property over which the road runs to CalFire.

14

provided for access; (3) "quiet title & implied easement/license action" on the ground White detrimentally relied on "representations and capricious conduct" by CalFire; (4) "public and private nuisance" on the ground that by closing the access road CalFire is creating both a public and private nuisance; (5) "intentional & reckless endangerment to health & safety" on the ground CalFire's closure of the road creates an "unreasonable risk of physical and psychological harm to" to White and the "public living in the vicinity"; (6) "unlawful public road closure"; (7) "violation of public trust doctrine"; and (8) declaratory relief. (Capitalization & boldface omitted.)

CalFire interposed a demurrer as to all causes of action against it on both res judicata grounds and the merits.

The trial court sustained the demurrer without leave to amend on the ground of res judicata.[8] The court essentially repeated the analysis set forth in its order dismissing her 2017 lawsuit, ruling that only one "primary right" has been at issue since the outset of litigation—White's "claim of road access to her property." The court again rejected her assertion that the facts had "materially changed" given CalFire's decommissioning of the road and therefore res judicata was not a bar to her latest lawsuit.

Pursuant to a stipulation that the court would issue a like ruling on the anticipated demurrer by the Public Works Board, the trial court also dismissed the only cause of action (the second cause of action) asserted against the Board.

White filed a notice of appeal. (Appeal No. 162978.)

***The 2021 Lawsuit***

---

[8] It also granted CalFire's request for judicial notice filed December 24, 2020, and its supplemental request filed January 19, 2021.

Three months after the judgments in favor of CalFire and the Public Works Board were entered, White filed a fourth lawsuit (fifth if you count the mandamus proceeding), this time naming as defendants the State Lands Commission and the Public Works Board.

White again alleged that in 1946 the state purchased the land bounding White's parcel on three sides from a logging company and in 1949, created the state forest. She further alleged that within the forest lands there were private landholdings that were accessed by unimproved roads running across the state property. A "1949 title report" allegedly noted these roads were "not . . . objectionable" to CalFire and "did not interfere with operations." "To accommodate those private landowners," "CDF" (the acronym White now used, although we will continue to use CalFire) "offered free deeded easements" during "the 1980's and 1990's," many of which were granted and exist at the present time. White also alleged the Board of Forestry implemented its Policy 0351.8 "to explicitly articulate a grant-of-easement policy to allow adjacent owners access, use and development of their parcels." Such easements were granted even when they were not the sole means of access. CalFire records allegedly reflected that White's "deceased husband and his brother, who then owned the parcel, were offered such an easement in 1983." "For unknown reasons, [CalFire] never provided the Whites an easement similar to that given to others." Although CalFire has stated it has no need for and is decommissioning the road, it continues to refuse to negotiate with White for an easement or road use agreement. Its refusal has rendered White's parcel "virtually valueless."

White asserted nine causes of action: (1) "fraudulent or negligent land transfers in violation of state public policy and/or failure to disclose title defects" on the alleged ground the state had and violated "a common law

16

fiduciary obligation of due diligence to disclose a potential cloud on the title and to ensure that any visible and known road access across these lands either be maintained or extinguished"; (2) "deed reformation & specific performance" on the alleged ground that through fraud or mistake the 1946 deed to White's predecessor-in-interest failed to express the intent of the parties to provide access; (3) "Hinrichs-Linthicum equitable action to establish right of access" on the alleged ground White's parcel is "landlocked"; (4) "quiet title & implied easement/license action" on the alleged ground White and her predecessors-in-interest "detrimentally relied" on "representations and conduct" by the state personnel of a right to continued access; (5) "public and private nuisance" on the alleged ground closing the road will adversely impact fire-fighting capability and restrict access by emergency vehicles and utility companies; (6) "intentional & reckless endangerment to health & safety" on the alleged ground closing the road will create "unreasonable and highly dangerous risk of physical and psychological harm" to White and the local community; (7) "unlawful public road closure" on the alleged ground closures must be handled by the State Highway Commission and there must be compliance with CEQA; (8) declaratory relief; and (9) "unlawful taking/inverse condemnation" on the alleged ground White's and her predecessors-in-interest's use of the road "created a property right of access in the nature of an oral license or oral contract" which the government will "tak[e]" by closing the road.

The defendants demurred on numerous grounds, summing up the only factual allegations as to the Lands Commission and the Public Works Board as follows: "The Complaint's sole factual allegations against the Commission are that, in 1946, the Commission transferred a parcel to White's predecessor-in-interest . . . and in 1968, it transferred the adjacent access

17

road parcel to the [Public Works] Board." "The Complaint's sole factual allegations against the [Public Works] Board are that, in 1968, the [Public Works] Board 'administered conveyance of the parcel over which the disputed road traverses' to the State . . . 'to be part of the [Forest],' and that in doing so it allegedly failed to reference the 'existing disputed road' or 'provide explicit rights of access to a public road.'" In short, as to the actual named defendants, White was complaining about a conveyance by the Commission that had occurred 75 years ago, and a separate transfer by the Public Works Board 50 years ago.

As to the first and second causes of action, defendants maintained White had not pleaded her claims with sufficient particularity and not alleged the existence of any legal duty they had breached. As to the third through seventh causes of action, they were based on alleged conduct by CalFire and not on any alleged action by the Lands Commission or the Public Works Board. To the contrary, White's own allegations established that during the time frame relevant to these causes of action, neither the Commission nor the Public Works Board had any interest in either White's parcel or the state forest land through which the road passes. The eighth cause of action for declaratory relief was simply derivative of her other claims and therefore also failed. Her ninth cause of action for a "taking" also was not based on any actions by the Commission or the Public Works Board, and it had already been adjudicated, in any event, that White had no right of access over the state forest land. The defendants further maintained all the causes of action as against the Commission and Public Works Board were barred by the applicable statutes of limitations or laches, and by the doctrine of res judicata.

18

The clerk's transcript contains no written opposition by White and only a request for judicial notice of a copy of the 1946 conveyance of the parcel to White's predecessor-in-interest.

The trial court sustained the defendants' demurrer without leave to amend without specifying the particular ground(s) for doing so.

White filed a notice of appeal. (Appeal No. A165182.)

DISCUSSION

### Causes of Action Based on Asserted Right of Access Through the State Forest Land

#### General Preclusion Principles

We start with a recap of our Supreme Court's discussion of the res judicata doctrine in *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 823 (*DNK Holdings*), in which the high court acknowledged courts have not been consistent in their utilization of the terms "res judicata" and "collateral estoppel." The high court, itself, has "frequently used 'res judicata' as an umbrella term encompassing both claim preclusion and issue preclusion," which it "described as two separate 'aspects' of an overarching doctrine." (*Ibid.*) However, "[c]laim preclusion, the ' " 'primary aspect' " ' of res judicata, acts to bar claims that were, or should have been, advanced in a previous suit involving the same parties." (*Id.* at p. 824.) In contrast, "[i]ssue preclusion, the ' " 'secondary aspect' " ' historically called collateral estoppel, describes the bar on relitigating issues that were argued and decided in the first suit." (*Ibid.*)

As the Supreme Court explained, "[i]t is important to distinguish these two types of preclusion because they have different requirements." (*DKN Holdings, supra*, 61 Cal.4th at p. 824.)

19

Claim preclusion (or res judicata) " 'prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them.' [Citation.] Claim preclusion arises if a second suit involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit. [Citations.] If claim preclusion is established, it operates to bar relitigation of the claim altogether." (*DKN Holdings, supra*, 61 Cal.4th at p. 824.) This aspect of the doctrine promotes judicial economy by preventing claim splitting. It requires all claims based on the same cause of action, which were *or could have been* raised, to be decided in a single suit. (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 92–93, italics added (*Kim*).)

Issue preclusion (or collateral estoppel) "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action. [Citation.] There is a limit to the reach of issue preclusion, however. In accordance with due process, it can be asserted only against a party to the first lawsuit, or one in privity with a party." (*DKN Holdings, supra,* 61 Cal.4th at p. 824.) "Issue preclusion differs from claim preclusion in two ways. First, issue preclusion does not bar entire causes of action. Instead, it prevents relitigation of previously decided issues. Second, unlike claim preclusion, issue preclusion can be raised by one who was not a party or privy in the first suit. [Citation.] 'Only the party against whom the doctrine is invoked must be bound by the prior proceeding. [Citations.]' [Citation.] In summary, issue preclusion applies (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit

and (4) asserted against one who was a party in the first suit or one in privity with that party."[9] (*DKN Holdings,* at pp. 824–825, italics omitted.)

As we have recited, White has sued a number of defendants in her lawsuits. However, the judgments at issue in these appeals are those entered in favor of the state defendants—CalFire, the Board of Forestry, the Public Works Board, four individual state employees, and the Lands Commission, all of which are represented by the Attorney General. We have no hesitation in concluding that these state defendants can invoke the doctrine of claim preclusion (res judicata) as privies. (See *DNK Holdings, supra,* 61 Cal.4th at p. 826 ["As applied to questions of preclusion, privity requires the sharing of 'an identity or community of interest,' with 'adequate representation' of that interest in the first suit, and circumstances such that the nonparty 'should reasonably have expected to be bound' by the first suit."]; see also *Grande v. Eisenhower Medical Center* (2022) 13 Cal.5th 313, 326.)

### Same Primary Right

In determining whether the first requirement for claim preclusion (or res judicata) applies—that the "same cause of action" has been asserted in a subsequent lawsuit between the same parties (or their privies)—a court must "discern whether the lawsuits involve the same 'primary right.' " (*5th & LA v. Western Waterproofing Co., Inc.* (2023) 87 Cal.App.5th 781, 788, italics omitted.)

---

[9] Thus, the Attorney General is mistaken in stating in his respondents' brief that "[i]t does not matter if the party asserting the doctrine of res judicata as a defense was not a party to the original case, so long as the party against whom res judicata is asserted is the same." That is correct as to issue preclusion (i.e., collateral estoppel). It is incorrect as to claim preclusion (i.e., res judicata) which bars relitigation of the same claim between the *same* parties (and/or their privies). (*DKN Holdings, supra*, 61 Cal.4th at pp. 825–826.)

21

" ' "The primary right theory is a theory of code pleading that has long been followed in California. It provides that a 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.] The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. [Citation.] . . . [¶] As far as its content is concerned, the primary right is simply the plaintiff's right to be free from the particular injury suffered. [Citation.] It must therefore be distinguished from the legal theory on which liability for that injury is premised: 'Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief.' [Citation.] The primary right must also be distinguished from the remedy sought: 'The violation of one primary right constitutes a single cause of action, though it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other.' " ' " (*Colebrook v. CIT Bank, N.A.* (2021) 64 Cal.App.5th 259, 263 (*Colebrook*), italics omitted.)

In short, "[u]nder the 'primary rights' theory, a cause of action arises from the invasion of a primary right. Although different grounds for legal relief may be asserted under different theories, conduct that violates a single primary right gives rise to only one cause of action." (*DNK Holdings, supra,* 61 Cal.4th at p. 818, fn. 1.)

### *Right of Access*

As we have recited, the trial court identified the "primary right" which White has sought to vindicate in virtually all of the causes of action in her 2010, 2017, 2020, and 2021 lawsuits as the "right of access" to her property through the state forest land.

White insists this is not so and that her 2010 lawsuit "[a]ddressed" only her "right to obtain an easement and not her right to access, itself." (Capitalization omitted.) This assertion disregards that a primary right is not defined by the particular legal theory advanced or ground for relief sought in the first lawsuit. (*DNK Holdings, supra,* 61 Cal.4th at p. 818, fn. 1; *Colebrook, supra,* 64 Cal.App.5th at p. 263.) Rather, a "primary right" is " ' "simply the plaintiff's right to be free from the particular injury suffered." ' " (*Colebrook,* at p. 263.)

The injury White has sought to rectify in all her lawsuits, under innumerable theories, is interference with an asserted right of access to her property. The doctrine of claim preclusion (res judicata) prohibits her from advancing these theories seriatim over the course of more than a decade. To the contrary, White was required to raise in her 2010 lawsuit *every* theory that " 'could have been' " raised to rectify the abridgement of her asserted right of access. (*Kim, supra,* 9 Cal.5th at pp. 92–93.) This embraced, for example, every species of asserted easement or use agreement (e.g., prescriptive easement, equitable easement, easement by necessity, implied easement, reformation of deed to include a right of access, irrevocable license) and all asserted claims of injury based on or arising from interference with or abridgment of her asserted right of access (e.g., inverse condemnation, nuisance, unlawful public road closure).[10] (See *Colebrook, supra,*

---

[10]  At oral argument, White continued to insist her 2010 lawsuit concerned only the scope of her permissive use of the road through the state forest land at that time, and therefore it cannot be fairly said she claimed a "right of access" across that land. However, as we have recited, in her original complaint White alleged in her first cause of action, for quiet title, that she and her predecessors "either own the roadway at issue or have established their right to an easement . . . based on implication, necessity or prescription, or as a matter of equity including collateral estoppel." In her

64 Cal.App.5th at p. 264 ["primary right alleged to have been violated" was plaintiff's "ownership interest in the property," and all claims in her fourth lawsuit, as in her prior lawsuits, were "premised upon" and "flow[ed] from" asserted interference with that right]; *Gillies v. JPMorgan Chase Bank, N.A.* (2017) 7 Cal.App.5th 907, 910, 914 [each of plaintiff's four lawsuits challenging efforts to foreclose sought to vindicate same primary right][11].)

And as to any causes of action not based on the same primary right, the doctrine of issue preclusion (collateral estoppel) bars White from relitigating all issues tried and decided adversely to her in her 2010 lawsuit.

Indeed, White's principal arguments are directed not at the fundamental requirements of claim and issue preclusion, but rather on the asserted equities of her case and, specifically, CalFire's supposed repudiation

second amended complaint, she further alleged as to quiet title, that her right to use the road was "based on a claim of necessity that is implied from the fact [the state] was the common owner of plaintiff's parcel" and the state forest land surrounding the parcel on three sides, and the state, "as common owner, intended to convey whatever was necessary for the beneficial use of plaintiff's parcel." She alleged her claim was "based additionally on principles of equity, including equitable estoppel and promissory estoppel," and she and her predecessors had "relied to their detriment on assurances made over the years and up until recently that defendants would provide a deeded easement." She further alleged her predecessors in interest had obtained a prescriptive right to the portion of the road that had once been on private property that was later conveyed to the state. Thus, contrary to her oral argument, White's 2010 lawsuit did, indeed, involve a claimed right of access over the forest property and advanced a number of theories to that end.

[11] At oral argument, White expressed umbrage at the cited cases as involving vexatious litigants. Neither is an appeal from a vexatious litigant determination. Rather, both these recent cases discuss what constitutes a cause of action for purposes of claim and issue preclusion (i.e., res judicata and collateral estoppel), the exact issue we are addressing here. None of the older cases White cites in her briefing calls into question either the principles enunciated in these cases or their application.

of years of assurances of access when, in 2017, the then forest manager notified White the road would be decommissioned[12] and, in 2019, CalFire filed a NOE to proceed with decommissioning. It is clear from White's allegations that she and her attorney felt blindsided by the NOE since White had obtained a preliminary injunction maintaining the status quo and she and her attorney believed progress was being made towards reaching an agreement on access.

As White points out, "[n]either res judicata nor collateral estoppel was ever ' "intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which have altered the legal rights or relations of the litigants." ' " (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 179–180, quoting *Evans v. Celotex Corp.* (1987) 194 Cal.App.3d 741, 748.)

But White has focused only on the "facts have materially changed" aspect of this exception to preclusion. Even assuming CalFire's decommissioning of the road and refusal to further negotiate an access agreement constituted "materially changed facts" (and we are not suggesting that is so given the decades' worth of fits and starts of discussions with no

---

[12] In January 2017, CalFire adopted an updated "Jackson Demonstration State Forest Management Plan" which included as an appendix a "Road Management Plan." The Forest Management Plan and the Road Management Plan called for an inventory of the roads within the forest and the identification of roads that would be "abandoned" (i.e., closed or decommissioned). These included roads "no longer required for management and recreation purposes." "The goal [was] to complete the entire road and closing inventory within three years." The updated Forest Management Plan was certified by the forest manager who told White the road would be decommissioned.

agreement about access), White disregards the additional requirement that these changed facts would have " ' "altered the legal rights or relations of the litigants." ' " (*Union Pacific Railroad Co., supra,* 231 Cal.App.4th at p. 180.)

That CalFire finally took action to close the road and ceased discussions with White, did not "alter" her legal rights—or more to the point, her lack of legal rights—to access her property through the state forest land. She litigated her asserted right of access in her 2010 lawsuit and lost. Accordingly, she had *no* right of access that CalFire could abridge by decommissioning the road. All White "had" after the conclusion of her 2010 lawsuit and affirmance of the judgment on appeal in 2015, was access at the largesse of CalFire, revocable at any time.

White nevertheless persists in asserting CalFire's earlier assurances of access were pivotal to the initial judgment against her. As we have recited, the trial court did take the assurances CalFire had made as of the time of trial in January 2014 into account in finding White had not established the second and third requirements to create an equitable easement. But as defendants point out, the trial court also found White had not established even the first requirement—"innocence and reasonableness" of her claim of entitlement to use of the road. In answer to "whether the Whites had a good faith belief, based on a diligent investigation, that they had unfettered rights to use the roadway," the court found "[t]he answer to this question is clearly no." As defendants further point out, this court affirmed *that* specific finding and observed White's "failure to surmount this first hurdle is dispositive."

Accordingly, CalFire's assurances as of January 2014 were not the sine qua non of the judgment in White's 2010 lawsuit nor of this court's affirmance of that judgment in 2015. Furthermore, as the trial court observed in granting summary judgment in the 2017 lawsuit, there is *no*

26

evidence CalFire ever promised White she could use the road "for all time." Indeed, in closing argument in the January 2014 trial, White's counsel argued to the court CalFire had given *no* assurance of continued access.

White discounts the significance of the trial court's finding that she failed to establish the first requirement for an equitable easement (and this court's affirmance of that finding), asserting the law has changed and the "innocent use doctrine" is now "obsolete & inapplicable" (boldface & capitalization omitted) and there is now a more vigorous doctrine of easement by necessity, citing to *Hinrichs, supra,* 11 Cal.App.5th 516 and *Linthicum, supra,* 175 Cal.App.4th 259.  (See *People v. Strong* (2022) 13 Cal.5th 698, 716–717 ["one well-settled equitable exception to the general rule holds that preclusion does not apply when there has been a significant change in the law since the factual findings were rendered that warrants reexamination of the issue"; the significant change to felony murder made by *Banks* and *Clark* represented "the sort of significant change that has traditionally been thought to warrant reexamination of an earlier-litigated issue"].)

The fundamental difficulty with White's argument is that the *Linthicum* and *Hinrichs* cases do not represent a "significant change in the law" between the judgment in her 2010 lawsuit, rendered in 2014 and affirmed on appeal in 2015, and the first of her three subsequent lawsuits filed in 2017.  To the contrary, *Linthicum* was decided in 2009, before White filed even her first lawsuit.  Moreover, this court discussed *Linthicum* in its opinion affirming the judgment against White in that lawsuit.

*Hinrichs* was decided in 2017 by the same court that decided *Linthicum*.  In *Linthicum* the court had affirmed a judgment imposing an equitable easement to access "landlocked" property where the owner thereof had been using a roadway over neighboring property for several decades.  In

27

*Hinrichs*, the court affirmed a judgment finding an easement by necessity over one parcel and a connecting equitable easement over another parcel holding, among other things, that a court can grant an equitable easement "without there being a preexisting use" by the owner seeking the easement. (*Hinrichs, supra*, 11 Cal.App.5th at p. 519.) In articulating the inquiry pertinent to an equitable easement, the appellate court did not jettison the basic elements that must be established for an equitable easement. To the contrary, citing to its prior decision in *Linthicum,* the court stated, among other things, that "[t]he court should consider whether the need for the easement is the result of the willful act of the party seeking the easement." (*Id.* at p. 522.) Thus, *Hinrichs* does not reflect any change in the law pertaining to equitable easements, let alone a significant change. White's real complaint is that in *Linthicum* and *Hinrichs* the trial courts granted equitable easements, whereas the trial court here did not. But under no exception to the preclusion doctrines is that a ground to disregard the finality and preclusive effect of the trial court's judgment.[13]

White also points out that "[i]n rare circumstances, a final judgment may be denied claim preclusive effect when to do so would result in manifest injustice." (*F.E.V. v. City of Anaheim* (2017) 15 Cal.App.5th 462, 465.) She insists that would be the result here.

---

[13] We also note that the equitable easement granted in *Hinrichs* was "over a small portion of" an adjoining property that the owners rarely visited and used for no purpose, and the easement crossed the " 'very back' " of the property, which was separated from the rest of the property by a creek bed. Given these facts, the trial court found the " ' "relative hardship[s]" ' " " 'clearly favor[ed]' " the owner seeking access. (*Hinrichs, supra*, 11 Cal.App.5th at p. 522.) Here, there were different facts, and the trial court reached a different conclusion.

We disagree. White's 2010 lawsuit was litigated over the course of five years, and a full trial was held on the issue that undergirds all of her claims—whether she is entitled to access her property through the state forest land. The evidence established that White's predecessors acquired the parcel knowing there was no written or recorded right of access through the state property[14] and they had multiple opportunities over the succeeding decades to pursue such a right. For reasons unknown, they never did. White adduced *no* evidence the state ever inadvertently, let alone deliberately, led White's predecessors to delay or abandon efforts to secure a right of access. As the trial court stated in its written decision following trial, given CalFire's prior offer of an easement, "[t]he Whites . . . cannot fault CALFIRE for their own lack of diligence" in failing to follow through. Thus, unlike in a case where the record suggests the plaintiff might succeed if not foreclosed by claim or issue preclusion, the record here does not hold any such portent.

Moreover, the relentlessness of White's litigation argues for application of the preclusion doctrines. " 'A predictable doctrine of res judicata benefits both the parties and the courts because it "seeks to curtail multiple litigation causing vexation and expense to the parties and wasted effort and expense in judicial administration." (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 280, p. 820.)' " (*Gillies, supra,* 7 Cal.App.5th at p. 914, quoting *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 897, italics omitted.)

In sum, the trial court did not err in concluding all her causes of action against the state defendants based on or seeking to vindicate an asserted

---

[14] The trial court expressly found there was no "evidence in the record that anyone in the chain of title was ever misled about there being a right of access to the parcel."

right of access through the state forest land are barred by claim preclusion (res judicata).

**"Stand Alone" Claims**

White maintains the trial court failed to appreciate that she also asserted a number of "independent and free-standing claims unrelated to any primary right theory." (Capitalization & boldface omitted.)

### CEQA Claim

White's ninth cause of action in her seconded amended complaint in her 2017 lawsuit alleged the decommissioning of the road was "undertaken in violation of CEQA" (as well as several forest management plans) and "conflict[ed] with defendants' obligation under its programmatic FEIR . . . to maintain and expand recreational opportunities and [was] likely to lead to soil erosion in the vicinity of the road." She asserted defendants' "action [was] designed to force [her] to construct a new access road through and across two blue-line streams, the result of which would be to endanger the watercourses and endangered or threated species residing in them or in the riparian corridor associated with them."[15]

The trial court sustained defendants' demurrer to this cause of action on multiple grounds: (1) the 35-day statute of limitations for challenging a NOE had run (Pub. Resources Code, § 21167, subd. (d)); (2) White failed to timely request a hearing within 90 days of filing her lawsuit as required by Public Resources Code section 21167.4, subdivision (a); and (3) she "fail[ed] to allege any non-speculative facts indicating the manner CEQA" was violated.

White addresses only the first ground—that she failed to timely challenge the NOE. This precludes her from obtaining relief on appeal.

---

[15] Contrary to her claim in her opening brief, White did not allege a CEQA claim in her 2020 lawsuit.

Where the appellant fails to address alternative grounds on which a judgment is sought and granted, we assume the alternative grounds support the judgment and must affirm. (*Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 571–572 (*Lafferty*); *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125–126 (*Christoff*).)[16]

Furthermore, the trial court did not err in ruling her CEQA claim, which was based on CalFire's decision to decommission the road and the filing of a NOE to do so, was barred by the 35-day limitations period. This

---

[16] In *Lafferty*, for example, the trial court granted summary adjudication to the defendant on a number of causes of action on numerous grounds. (*Lafferty, supra*, 213 Cal.App.4th at pp. 571–572.) On appeal, the plaintiffs challenged only the trial court's evidentiary ground that they had failed to present any competent evidence raising a triable issue (which flowed from the sustaining of defense objections to much of the plaintiffs' evidence). (*Id.* at p. 571.) The plaintiffs did not address the separate legal grounds on which the defendant had moved for, and the court had granted, summary adjudication. (*Ibid.*) As the Court of Appeal explained, it had no choice but to affirm: "Even if we assume the [appellants'] arguments regarding the trial court's evidentiary rulings are meritorious, we would nonetheless be compelled to affirm the order granting summary adjudication. ' "A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." ' (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564. . . .) [¶] Here, the [appellants] have failed to address how the trial court erred in concluding legal grounds separate from the evidentiary issues supported summary adjudication. . . . Consequently, we deem the contention that the trial erred in granting summary adjudication to be forfeited for failure to present arguments as to the separate grounds for dismissing the [appellants'] six remaining causes of action." (*Id.* at pp. 571–572; see *Christoff, supra*, 134 Cal.App.4th at pp. 125–126 [where appellant failed to challenge ruling on causation, a separate ground on which the trial court granted summary judgment, plaintiff forfeited the issue, which, in turn, was dispositive and sufficed to affirm the judgment].)

time period commences when the lead agency files the NOE with the Office of Planning and Research and it is posted on its Web site. (Pub. Resources Code, §§ 21108, subd. (b) & (c), 21167, subd. (d); see generally *Committee to Relocate Marilyn v. City of Palm Springs* (2023) 88 Cal.App.5th 607, 631 ["the filing of the notice of exemption triggers the running of a shortened 35-day statute of limitations period for the filing of any legal challenge to the exemption finding. (Pub. Resources Code, § 21167, subd. (d); Guidelines, §§ 15062, subd. (d), 15112, subd. (c)(2).)"].) Here, the NOE was filed on February 14, 2019, and White first alleged a CEQA claim in her second amended complaint on July 5, 2019, 141 days later.

White appears to maintain either that her time to challenge the NOE did not commence running at the usual time (on posting on the Web site) or that she was excused from complying with the 35-day limitations period, because she assertedly was entitled to individual notice under Public Resources Code section 21167, subdivision (f).

That statutory provision states that "[i]f a person has made a written request to the public agency for a copy *of the notice specified in [Public Resources Code] [s]ection 21108* [that is, a NOE] . . . before the date on which the agency approves or determines to carry out the project," then the agency shall mail notice to such person within five days. (Pub. Resources Code, § 21167, subd. (f), italics added.) As defendants point out, White did not allege or make any showing in the trial court that she made a written request for a copy of the NOE, and she provides no record citation to such in her briefing on appeal.

Instead, White refers in her briefs to "prior correspondence" between her lawyer and CalFire's general counsel wherein her lawyer assertedly sought "notice of any changed position as to road access." The only record

citation she provides anywhere in her briefs of such "correspondence" is to a declaration by her attorney filed in support of temporary or preliminary injunctive relief, wherein he recounted his efforts to resolve the dispute over access. This included reciting an e-mail string (he did not provide a copy of the actual e-mail string) with CalFire's legal counsel in which he (White's attorney) towards the end of the string states, "I won't waste anyone's time, then [pursuing an access agreement]. Provide me please a clear understanding of what 'decommissioning' means to your agency and a rough time table. I'll plan out another lawsuit. I assume I may be allowed to serve you directly?" He added a post-script stating, "I need clarity on your plans so that litigation may proceed in an orderly fashion and I need to know if an injunction must be requested immediately (with or without a TRO) and so that the judge is certain that decommissioning means road closure." This asserted e-mail string does not remotely constitute a request under Public Resources Code section 21167, subdivision (f) for a copy of any NOE associated with decommissioning the road. Furthermore, subdivision (f) goes on to state the "date upon which [individual] notice is mailed shall not affect the time periods specified in subdivisions (b), (c), (d) [the 35-day limitations period], and (e)." (Pub. Resources Code, § 21167, subd. (f).)

### *Due Process Claim*

White maintains the trial court also erred in "ignoring" her "procedural" and "substantive" due process claims.

As defendants point out, White never advanced a procedural due process claim in her 2017, 2020, and 2021 lawsuits. Rather, in her second amended complaint in her 2017 lawsuit, she asserted a cause of action (the fifth cause of action) for "violation of substantive due process & equal

33

protection." (Capitalization & boldface omitted.) White can hardly fault the trial court for "ignoring" a claim she never pled or asked leave to allege.

In any case, in her opening brief, White recognizes that whether there has been a procedural due process violation entails a two-part inquiry: "(1) is there a liberty or property interest of which the [person] has been deprived, and (2) if so, were the procedures followed by the state [in depriving the person of his or her liberty or property] constitutionally sufficient." White "maintains her property interest concerns both ownership of her parcel and reasonable access to that parcel based on historical use [apparently of the road] without suffering an arbitrary government landlock."

Thus, regardless of the label White might have affixed to her never-asserted claim, it is another *theory* to establish or vindicate an asserted right of access through the state forest land, which she is barred from pursuing by claim preclusion (res judicata). Even if her newly conceived due process claim could be said to vindicate a different primary right, the claim is barred by issue preclusion (collateral estoppel) and, specifically, the court's ruling in her 2010 lawsuit affirmed on appeal that she has *no* species of property interest in the road through the state forest land.

White did allege a claim for substantive due process in her second amended complaint in her 2017 lawsuit, asserting she had a "constitutional . . . interest at stake arising from her ownership of the involved property and to be free from the arbitrary exercise of government authority against her." She further alleged defendants violated her right to substantive due process "by applying vague, arbitrary, inconsistent, illogical standards, failing to abide by their own policies, standards, and representations." White maintained defendants' actions did "not involve discretionary decisions but [were] based on a punitive and malicious effort grounded in hatred and ill-

will, to impose financial harm" on her and to "cause her to surrender her land to defendants at no cost, while also placing her at risk of harm to herself and property." She additionally alleged defendants had violated "their own mandates" concerning emergencies and wildfire and that "eliminating all access" violated a variety of statutes and local codes.

The trial court sustained defendants' demurrer to this cause of action on two grounds: (1) that White's allegations were too conclusory; and (2) that a " 'threshold requirement' " for stating a substantive due process claim is " 'termination or revocation of an existing property interest in a benefit created by an independent source, such as state or federal law,' " (quoting *Rabkin v. Dean* (N.D.Ca. 1994) 856 F. Supp. 543, 549) and White had no such interest. Thus, as to the second ground, while the trial court did not expressly state White faced the bar of claim or issue preclusion, that is clearly the substance of the court's ruling.

In her opening brief, White does not address either of the grounds on which the trial court dismissed her substantive due process claim. For this reason, alone, she cannot prevail on appeal.[17] (See *Lafferty, supra,* 213 Cal.App.4th at pp. 571–572; *Christoff, supra,* 134 Cal.App.4th at pp. 125–126; see also *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237 (*JTH*

_____

[17] In her closing brief, White attempted to distinguish *Rabkin*, stating it "remain[ed] unclear [to her] how this case has any bearing on the dispute at hand." Advancing this argument for the first time in her closing brief was too little, too late. (See *Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 653 (*McLaughlin*) [appellant's "discussion of the issue in his reply brief comes too late"].) In any case, while *Rabkin v. Dean* (N.D.Cal. 1994) 856 F.Supp. 543 may have involved different facts (specifically a claim that the plaintiff had been wrongly deprived of a public employment benefit, i.e., of a protected property interest), the salient point, as the trial court recognized, was the need for a protectible interest, which the court had already decreed White did not have.

35

*Tax*) ["[w]hen a trial court states multiple grounds for its ruling and appellant addresses only some of them, we need not address appellant's arguments because 'one good reason is sufficient to sustain the order from which the appeal was taken' "].)

Instead, White urges a new theory—that the "government" can be held "accountable" "through the state-created danger doctrine," which she describes as an " 'affirmative duty to protect [that] arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." She asserts "the principle reasonably extends to [defendants] arbitrarily cutting off road access to appellant's land, such that she and any tenants . . . are rendered susceptible to serious harm or death because emergency responders would have great difficulty reaching them or they fleeing [*sic*] from the property in the event of forest fire or other natural disaster." She also urges, apparently as another additional theory, that the government can be held liable where an "agency acts with deliberate indifference after recognizing an unreasonable risk, intending to expose a citizen to such risk without regard to consequences." By failing to raise these theories in the trial court, White forfeited them. (See *In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 695 [we generally do not consider theories raised for the first time on appeal which could have been, but were not, presented to the trial court for consideration].)

Furthermore, these are new *theories* to establish or vindicate White's asserted right of access through the state forest land, which she is barred from pursuing by claim or issue preclusion.

### *Nuisance and Public Endangerment*

In her second amended complaint in her 2020 lawsuit, White alleged causes of action for "public and private nuisance" (fourth cause of action) and "intentional & reckless endangerment to health & safety" (fifth cause of action). (Capitalization & boldface omitted.) She maintained CalFire's closing of the road would create a "public nuisance" because it "will be eliminating an important fire access road that could be essential is [*sic*] stopping a fire . . . and endangering the [local] community." The closure would also "infringe[] on the right of entry of [PG&E]" and depriving PG&E "create[s] a public nuisance fire hazard." White asserted closing the road would also create a "private nuisance" that endangered her and her tenant as it "is the only means . . . in and out of the parcel for purpose of escape and/or provision of emergency services involving fire suppression and medical care." She further claimed the road closure would "unnecessarily disturb[]" her and her tenant's "right to quiet and safe enjoyment and use of the property."

White insists her nuisance and endangerment claims "were independent of any right to access and concerned the ramifications of road closure and landlocking her parcel," citing to Public Resources Code section 4171, which states "Any condition endangering public safety by creating a fire hazard and which exists upon any property which is included within any state responsibility area is a public nuisance." (Pub. Resources Code, § 4171.)

We agree with the trial court, however, that these causes of action are, at bottom, additional *theories* advanced by White to establish or vindicate a right of access through the state forest land, and the preclusion doctrines apply.

Furthermore, White has cited no authority supporting her assertion that closing an old logging road "creat[es] a fire hazard" within the meaning

of Public Resources Codes section 4171. This alleged conduct is not close, for example, to that alleged in *Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994) 24 Cal.App.4th 1036 (*Koll-Irvine*), wherein the plaintiff, an association of owners of commercial properties adjacent to the county airport, complained the county had approved the construction of "three 300,000 gallon above-ground fuel storage tanks located in the northwest quadrant of the airport 500 feet from the edge of the main runway," despite "studies done on behalf of the county recognizing the potential disaster in the event of an aircraft accident." (*Id.* at p. 1039.) The Court of Appeal acknowledged the complained-of conduct could, under the right circumstances, support a nuisance claim (notably under Civil Code section 3479, *not* under Public Resources Code section 4171). (*Koll-Irvine*, at p. 1040.)

The principal issue in *Koll-Irvine* was whether the plaintiff could, itself, pursue claims for public and private nuisance. The appellate court concluded it could not.

The association could not advance a public nuisance claim because a private party can do so only " 'if it is specially injurious to himself, but not otherwise.' ([Civ. Code,] § 3493.) The damage suffered must be different in kind and not merely in degree from that suffered by other members of the public." (*Koll-Irvine, supra*, 24 Cal.App.4th at p. 1040.) The court rejected the plaintiff's claim that "allegations of mental anguish, risk of higher insurance premiums, diminished property values and reduced usefulness of its premises constitute unique damages due to its proximity to the Fuel Farm." (*Id.* at pp. 1040–1041.) These alleged damages, said the court, applied "to all the homes and businesses in the area of the airport." (*Id.* at p. 1041.) Indeed, the complaint itself alleged " 'all members of the public

38

within 1000 to 1500 feet . . . would be killed and those within one and one-half to three miles would be injured' if the Fuel Farm exploded." (*Ibid.*) The plaintiff's "proximity arguably expose[ed] it to a higher degree of these damages, but not to a different kind altogether." (*Ibid.*)

Nor could the association advance a private nuisance claim—because "a private nuisance action cannot be maintained for an interference in the use and enjoyment of land caused solely by the fear of a future injury." (*Koll-Irvine, supra*, 24 Cal.App.4th at pp. 1041–1042.) A plaintiff must " 'show an actual physical invasion or damage to themselves or their properties. . . . [S]uch things as fear, anxiety, and emotional distress which are not caused by an interference with a specific private property right and which are common to the general population will not support a private action for nuisance.' " (*Id.* at p. 1042.) The court rejected the plaintiff's claim that its "allegations of diminution in property value, mental anguish due to fear of increased property insurance, and diminished use of its premises constitute[d] interference with specific property rights." (*Id.* at pp. 1042–1043.) "[T]hese . . . elements of damage," said the court, "must be caused by an interference with a property right," which the plaintiff could not allege. (*Id.* at p. 1043.)

White faces these same difficulties. While she maintains she alleged that she and her tenant will suffer damage "different in kind" than other members of the public, enabling her to advance a public nuisance claim, that is not the case. She complains, for example, about closure of a "fire access road that could be essential is [*sic*] stopping a fire trending east-to-west and endangering the *community* living around Mitchell Creek Road." (Italics added.) As for White's claim for private nuisance, it fails both because it is predicated on "fear of a future injury" (i.e., the theoretical possibility that

39

CalFire's fire-fighting capability will be hampered by closure of the road) and because she cannot allege "actual physical invasion or damage to" her property.

### *Public Trust Doctrine*

In her second amended complaint in her 2020 lawsuit, White alleged a cause of action (the ninth) for "violation of public trust doctrine." (Capitalization & boldface omitted.)  She asserted CalFire violated this doctrine by "arbitrarily chos[ing] to close public access to a portion" of the state forest that is used by the public "for recreational purposes and environmental preservation of surrounding pygmy forest and soils, in addition to open space."  She further maintained "[r]ecreational purposes . . . must be factored into any decision to close access to an existing thoroughfare within" the state forest.

We need not, and do not, decide whether this claim is merely another theory by which White seeks to establish or vindicate an asserted right of access through the state forest land.  CalFire demurred to this cause of action on the ground White did not, and could not, state a claim for violation of the public trust doctrine, and we agree.

" 'While the public trust doctrine has evolved primarily around the rights of the public with respect to tidelands and navigable waters, the doctrine is not so limited.' [Citation.]  More than ' "a set of rules about tidelands," ' or ' "a restraint on alienation by the government," ' this doctrine functions ' "largely as a public property right of access to certain public trust natural resources for various public purposes." [Citation.]' [Citation.]  Thus, the doctrine protects 'expansive public use of trust property.' " (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 233–234 (*San Francisco Baykeeper*) quoting *Center for Biological Diversity,*

40

*Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349, 1360 (*Center for Biological Diversity*).)

What constitutes "trust *property*" generally remains limited to navigable waterways, submerged lands, and tidelands in trust for the public. (See generally *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 433–441, 446; see also Araiza, *The Public Trust Doctrine as an Interpretive Canon* (2012) 45 U.C. Davis L.Rev. 693, 723–724 [extending the public trust doctrine beyond its "current water-based focus" to "dry land would represent a major expansion in its scope"]; *Golden Feather Community Assn. v. Thermalito Irrigation Dist.* (1989) 209 Cal.App.3d 1276, 1284 [public trust doctrine generally does not extend to nonnavigable waterways].) More recently, a California court has extended the doctrine to "undomesticated birds and wildlife," because they have historically " 'been held to belong to no one and therefore to belong to everyone in common.' " (*Center for Biological Diversity, supra,* 166 Cal.App.4th at pp. 1361, 1363.)

White has cited no authority in support of her assertion that the strip of land in dispute is public trust property. Nor are we aware of any such authority.

The range of "public *uses,*" in contrast, is broad, encompassing not just navigation, commerce, and fishing, but also the public right to hunt, bathe or swim. (*City of Berkeley v. Superior Court* (1980) 26 Cal.3d 515, 521.) The concept of a public trust use is also flexible, accommodating changing public needs. (*National Audubon, supra,* 33 Cal.3d at p. 434.) For example, an increasingly important public use is the preservation of trust lands " 'in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the

41

area.' " (*Id*. at pp. 434–435; accord, *San Francisco Baykeeper, supra,* 242 Cal.App.4th at pp. 233–234.) " 'Where . . . the propriety of a governmental reallocation of trust land from one public use to another is placed in question, the seminal opinion in *Illinois Central* [*Railroad Co. v. State of Illinois* (1892)] 146 U.S. 387, makes clear that courts should "look with considerable skepticism upon any governmental conduct which is calculated either to reallocate that resource to more restricted uses or to subject public uses to the self-interest of private parties." ' " (*San Francisco Baykeeper,* at p. 234.)

White did not allege that CalFire subjected any public use to the self-interest of private parties. Rather, she asserted CalFire changed its own use of a narrow strip of the state property it manages from use as a recreational access road to undeveloped forest land. (White also alleged, seemingly at odds with her allegation that the road was impressed with public trust recreational use, that she and "her predecessors [had] always maintained the roadbed and [had] cooperated with [CalFire] in maintaining a security gate, the key to which [CalFire] freely provided the landowners over the past 60 years.")

What is immediately apparent from White's allegations is that the "recreational" use she complains was not considered, and the maintenance of undeveloped forest land to which CalFire has now committed the strip of property at issue, are *both* public trust *uses*, and as evidenced by the case law are of *equal dignity*. (See *National Audubon, supra,* 33 Cal.3d at pp. 434–435.) The two uses are also mutually exclusive—use as an access road necessarily precludes use as undeveloped forest land. Accordingly, CalFire had to choose, and was entitled to choose, between these two *equally valued* public trust uses. (See *Monterey Coastkeeper v. Central Coast Regional Water*

42

*Quality Control Board* (2022) 76 Cal.App.5th 1, 21 (*Monterey Coastkeeper*) [" 'selecting one trust use "in preference to . . . [an]other cannot reasonably said to be an abuse of . . . discretion" ' "; "public trust uses are to be protected wherever *feasible*"].) Furthermore, despite the alleged importance White ascribes to recreation, it is, in fact, a use of only "secondary" importance in managing the state forest. The Forest Management Plan states "[T]he primary purpose of [the Jackson Demonstration State Forest] is to conduct innovative demonstrations, experiments, and education in forest management; that timber production will be the primary land use on [the forest], and that recreation is recognized as a secondary but compatible land use on [the forest]."[18]

The courts have also recognized that "[t]his inherently discretionary doctrine generally does not allow for intervention by the courts other than in the context of judicial review of administrative decisions. ' "Intervention by the courts [through a separate lawsuit under the public trust doctrine], other than by exercising oversight over the administrative process and ensuring that proper standards are applied, not only would threaten duplication of effort and inconsistency of results, but would require courts to perform an ongoing regulatory role as technology evolves and conditions change." ' " (*Monterey Coastkeeper, supra,* 76 Cal.App.5th at pp. 21–22, quoting *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 577.)

For these reasons, alone, White did not, and cannot, allege a viable cause of action under the public trust doctrine.

In addition, there is "no set 'procedural matrix' for determining state compliance with the public trust doctrine." (*San Francisco Baykeeper, supra,*

---

[18] As we have noted, the trial court granted CalFire's request for judicial notice of these government documents.

242 Cal.App.4th at p. 234.) And in the trial court, CalFire maintained that its Forest Management Plan (and Road Management Plan set forth therein), evidence that it did consider recreational uses in the course of preparing these plans and the ensuing NOE implementing these plans. As we have recited, the Management Plan does recognize recreation as a "secondary but compatible land use." It also states research and demonstration projects "shall include" "recreation" and "shall be directed to the needs of the general public" as well as "small forest landowners, timber operators, and the timber industry," and that CalFire will "[c]ooperate with the Department of Parks and Recreation in establishing" on the demonstration forest and an adjacent woodlands center "forest management demonstration areas that are compatible with recreation for educational purposes." It is therefore apparent CalFire did take into account recreational use in preparing its Forest Management Plan and Road Management Plan, both of which called for a survey of existing roads and the closure of roads no longer necessary to management of the forest land.[19]

### *Civil Rights Claim*

In her second amended complaint in her 2017 lawsuit, White alleged a cause of action for "civil rights violations" under title 42 United States Code section 1983 and Civil Code section 52.1. (Capitalization & boldface omitted.) She asserted defendants had "acted in a discriminatory fashion based on race and gender" and had interfered with her "constitutional rights by threats, intimidation and coercion, making unreasonable and irrational demands and establishing arbitrary rules on her use of [the access road] that are not

---

[19] It is also abundantly clear from the Forest Management Plan that the *principal* use of this demonstration forest has been, and will remain, research and demonstrations aimed at enhancing forest eco-systems and habitat, *not* public recreation.

44

imposed on others" using roads in the state forest or on those "with existing easements." She further asserted defendants had conspired to file a NOE while "hiding their actions" from her and that CalFire's general counsel had acted "outside the scope of his official and appropriate duties" in representing CalFire and, specifically, when conferring with White's attorney about dismissing her case. She sought "[e]quitable relief, damages and attorney fees" in connection with this cause of action.

The trial court sustained CalFire's demurrer to this cause of action on two grounds: (1) she cannot state a federal civil rights claim under title 42 United States Code section 1983 "against state agencies and their employees" because "[s]uch actors are immune from liability" by " 'virtue of the Eleventh Amendment and the doctrine of sovereign immunity' "; and (2) she did not, and could not, allege that she had filed a government claim for damages, a prerequisite to suing under Civil Code section 52.1.[20]

In her opening brief, White does not address either of these grounds. Thus, for this reason, alone, she also cannot prevail on appeal on this claim. (See *Lafferty, supra,* 213 Cal.App.4th at pp. 571–572; *JTH Tax, Inc.*, *supra,* 212 Cal.App.4th at p. 1237; *Christoff, supra,* 134 Cal.App.4th at pp. 125–126.)

Furthermore, the trial court correctly ruled that CalFire and its officials are not subject to a claim for damages under title 42 United States Code section 1983. But that is not because CalFire and its officials are "immune" from suit under the Eleventh Amendment or sovereign immunity.

---

[20] Commonly referred to as the Tom Bane Civil Rights Act, Civil Code section 52.1 "makes a person liable for conduct that deprives an individual of his or her rights 'secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of' California through 'threat, intimidation, or coercion.' " (*Pierce v. County of Marin* (N.D. Cal. 2018) 291 F.Supp.3d 982, 997, quoting Civ. Code, § 52.1, subd. (a).)

Rather, as this court explained at length in *Pierce v. San Mateo County Sheriff's Dept.* (2014) 232 Cal.App.4th 995, 1006–1011 (*Pierce*), it is because the state and its officials are, under controlling federal law, not "persons" subject to suit as that term is used in title 42 United States Code section 1983.[21]

In her closing brief, White asserts state officials can be sued for injunctive relief to end a " 'continuing violation of federal law,' " citing *Ex Parte Young* (1908) 209 U.S. 123, superseded by statute on another ground as stated in *E.E.O.C. v. Peabody Western Coal Co.* (9th Cir. 2010) 610 F.3d 1070, 1085–1086.  It is true a state official "is not shielded from liability under section 1983 where [the plaintiff] is seeking prospective injunctive relief." (*California DUI Lawyers Assn. v. Department of Motor Vehicles* (2022) 77 Cal.App.5th 517, 534, citing *Will v. Michigan Dept. of State Police* (1989) 491 U.S. 58, 71, fn. 10 ["a state official in his or her official capacity, when sued for injunctive relief, would be a person under [42 U.S.C.] § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State,' " quoting *Kentucky v. Graham* (1985) 473 U.S. 159, 167, fn. 14].)  However, this is not a claim White ever made in the trial court.  To the contrary, in her opposition to CalFire's demurrer, she disputed CalFire's assertion that she had " 'no such property interest,' " claiming " 'her land' " was "such an interest" and complaining that she had been subjected to " 'arbitrary' " action and not accorded "due process."  Moreover, had she sought prospective injunctive relief to effectively compel CalFire to grant her an

---

[21] We further explained in *Pierce* that the Eleventh Amendment "recognizes and preserves the states' common law immunity with respect to suits brought *in the federal courts*.  The amendment does not, itself, apply to actions brought in the state courts." (*Pierce, supra,* 232 Cal.App.4th at pp. 1013–1014.)

easement or use agreement, her claim would then have been another *theory* seeking to establish or vindicate a right of access through the forest land, which would have been barred by preclusion doctrines.

The trial court also correctly ruled White's state civil rights claim under Civil Code section 52.1 failed for lack of prior filing of a government claim. (See *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 764 ["[t]he fact that federal civil rights claims under 42 United States Code section 1983 are exempt from the requirements of the Government Claims Act . . . provides no reason to exempt claims under [Civil Code] sections 51 and 52.1], superseded by statute on other grounds as stated in *Nevarez v. Forty Niners Football Co. LLC* (N.D.Cal. 2018) 326 F.R.D. 562, 575, fn. 8; *Pierce v. County of Marin, supra,* 291 F.Supp.3d at pp. 1000–1001.) In her closing brief, White asserts "[CalFire] . . . knows that [she] filed multiple claim forms with the state but chooses not to mention either that or the fact that [title 42 United States Code] section 1983 actions are not subject to the government claims act." However, White supplies no record citation to any such claim form or to any request that the trial court take judicial notice of any such form and any action thereon.[22]

## DISPOSITION

The judgments in these consolidated appeals are AFFIRMED.

---

[22] Given our disposition of the issues, we need not and do not reach any other arguments advanced by the parties.

47

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Bowen, J.*

**Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A162967, A162978, A165182, White v. California Department of Forestry